**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| LIION, LLC, | ) | |
| An Illinois Limited Liability Company, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 18-cv-6133 |
| v. | ) | District Judge Ronald A. Guzman |
| | ) | Magistrate Judge Young B. Kim |
| VERTIV GROUP CORPORATION, | ) | |
| VERTIV CORPORATION, f/k/a Liebert | ) | |
| Corporation, EECO, INC., EMERSON | ) | |
| ELECTRIC CO., and EMERSON NETWORK | ) | |
| POWER | ) | |
| | ) | |
| Defendants, | ) | |

## AMENDED COMPLAINT

NOW COMES Plaintiff, LIION, LLC, a Nevada Limited Liability Company, ("LiiON")

by and through its attorneys, Barney & Karamanis, LLP, and complaining against Defendants

VERTIV GROUP CORPORATION ("VGC"), VERTIV CORPORATION, an Ohio

Corporation, f/k/a Liebert Corporation, f/k/a Vertiv Services, Inc., f/k/a Vertiv Solutions, Inc.,

f/k/a Emerson Power Network, f/k/a Emerson Network Power, ("Liebert"), EECO, INC., a

Delaware Corporation, ("EECO"), EMERSON ELECTRIC CO. ("Emerson Electric"), a

Delaware Corporation, and Emerson Network Power, ("ENP"), hereby states as follows:

## PARTIES AND JURISDICTION

1.      Plaintiff, LiiON, LLC, is a Nevada limited liability company with its principal

place of business located at 120 Prairie Lake Road, Unit A, East Dundee, Illinois 60118, and

with all of its members being residents of the State of Illinois.

2.      At all times relevant herein, Plaintiff was in the business of supplying customers with innovative stored energy solutions designed for data center, telecom, uninterruptable power system, and cable and wind/solar applications.

3.      Defendant Vertiv Group Corporation ("VGC") is a Delaware corporation, with its principal place of business at 1050 Dearborn Dr. Columbus, Ohio 43085.

4.      Defendant Vertiv Corporation ("Liebert") is an Ohio corporation, with its principal place of business at 1050 Dearborn Dr. Columbus, Ohio 43085.

5.      Defendant EECO, Inc. ("EECO") is a Delaware corporation, with its principal place of business at 850 Library Avenue Newark, DE 19711.

6.      Defendant Emerson Electronic Co. ("Emerson") is a Delaware corporation, with its principal place of business at 8000 West Florissant Avenue St. Louis, MO 63136.

7.      Defendant Emerson Network Power was formerly a subsidiary of Emerson Electronic Co. until it was sold in or around July of 2016 to Vertiv Group Corporation.

8.      On information and belief, at all times relevant, VGC was the principal and parent company of Defendant Liebert and Defendant Emerson Network Power (after July 2016)("Vertiv Corporation").

9.      On information and belief, Emerson Electronic Co. was he principal and parent company of Defendants, EECO, Inc. and Emerson Network Power (before July 2016) (ENP1).

10.     VGC, Liebert, and ENP2 will be collectively referred to as "VERTIV."

11.     Emerson Electric Co., EECO, Inc., and ENP1 will be collectively referred to as "EMERSON."

12.     This Court has personal jurisdiction over VERTIV and EMERSON consistent with the requirements of the Due Process Clause of the United States Constitution and the

Illinois Long Arm Statute. Vertiv conducts business, maintain established places of business, and has misappropriated Plaintiff's trade secrets and/or have induced and/or contributed to acts of trade secret misappropriation by others in the Northern District of Illinois, State of Illinois, and elsewhere in the United States.

13.     This Court has subject matter jurisdiction over this matter pursuant to Plaintiff's federal trade secret claim pursuant to the Defend Trade Secrets Act, 18 U.S.C. §§1836-39 *et seq.*, and 28 U.S.C. §1331 and §1343. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367. Jurisdiction is also based on diversity pursuant to 28 U.S.C. § 1332, and the matter in controversy exceeds, exclusive of interest and costs, $75,000.00.

14.     Venue is proper in this judicial district because VERTIV and EMERSON have misappropriated the trade secrets of an Illinois limited liability company whose members are Illinois residents. VERTIV and EMERSON committed acts of misappropriation in this judicial district and maintains regular and established places of business in this judicial district.

## **FACTS COMMON TO ALL COUNTS**

15.     Uninterruptable power solutions ("UPSs") are marketed toward large buildings, corporations, data centers, or other establishments in need of alternative back-up power.

16.     The purpose of a UPS system is to maintain a continuous supply of power and energy to a building or facility in the event of a power outage.

17.     These systems are intended to supply large amounts of energy to the customer's facility for a limited duration until the facility's back-up generators can kick in.

18.     Customers in this market look for power solutions that are highly reliable, safe, and have a long life expectancy.

19.     Since the early 2000s, the primary technology used for UPS solutions was valve-regulated lead-acid ("VRLA") systems.

20.     However, though VRLA systems are highly reliable and relatively cheap, they require continuous maintenance and monitoring.

21.     Specifically, VRLA system lead-acid batteries must be monitored often and replaced if they are failing.

22.     Typically, VRLA system lead-acid batteries begin failing and necessitate replacement at three (3) years, and then require a wholesale system replacement after five years.

23.     Moreover, VRLA systems require large amounts of space to house the battery cabinets necessary for storage of the VRLA system, and also require specialized ventilation and cooling methods to ensure the batteries remain safe and stable.

24.     Despite these weaknesses, VRLA lead-acid systems remain the industry leading products sold to UPS customers around the globe.

25.     As a preferred alternativeto VRLA lead-acid systems, the introduction of lithium-ion UPS systems into the marketplace has provided a reliable, safe, and long-lasting alternative to VRLA systems without the need for continued maintenance.

26.      In 2009, a group of senior power quality experts formed LiiON, LLC, for the purpose of leveraging their extensive knowledge and relationships to provide advanced, safe, and cost-effective power solutions to customers.

27.     LiiON has since designed, built, and introduced into the marketplace, stored energy solutions for the UPS/Data Center, Telecom, Cable, Solar, Electrical Grid and Portable power market segments.

28.     Beginning in 2011, LiiON began developing intellectual property for the implementation of more advanced stored energy solutions, which included base lithium chemistry applications for serviceable stored energy solutions.

29.     LiiON has strived to provide cutting edge technologies to make these lithium based energy solutions more feasible for bulk manufacturing, more cost-effective for customers, and generally more efficient than its competitors' products and VRLA systems.

30.     Since 2011, LiiON developed the engineering, product development, certifications, and conducted the Underwriters Laboratories' ("UL") testing for its new technology, which has allowed LiiON to provide large scale, controllable, lithium-based stored energy solutions to its customers.

31.     LiiON was at the forefront of the adoption of disruptive and impactful lithium-ion technologies to replace current industry leading lead-acid battery offerings.

32.     Key to LiiON's customer acquisitions and sales execution strategies are their UL certifications and their battery and energy management system software.  In the process of obtaining their various UL certifications, they were able to evaluate different original equipment manufacturer ("OEM") UPS platforms and how they perform with different battery manufacturer's chemistries.

33.     In or around 2012, while under a non-disclosure agreement, LiiON paired with Valence, a chemistry company, to develop and create a lithium battery that would meet LiiON's projected needs and specifications.

34.     From 2011 to 2014, LiiON painstakingly tested the lithium ion batteries in conjunction with their cabinets to form proprietary and secret processes and methodologies.

35.     The two and a half years of research required hundreds of man hours and substantial capital to achieve.

36.     Through that trial and error process over the approximately three year time frame, Plaintiff uncovered certain capabilities of the lithium batteries, and also developed various requirements relating to the management of those batteries.

37.     This trial and error period allowed LiiON to develop proprietary algorithms to control the lithium ion system, and would further allow those systems to work more efficiently and at higher rates than LiiON's competitors' systems.

38.     To engineer such innovative power solutions, LiiON and its agents created various technologies and processes including, but not limited to various trade secrets and pending patents.

39.     Those pending patents were employed with specific and secret processes and combinations of other technology, which allowed for more efficient energy solution products without the added cost.

40.     Specifically, LiiON's groundbreaking alternative stored energy solutions provided UL-listed lithium powered on-demand stored energy solutions for uninterruptible power systems ("UPS"), which delivered safe, long-lasting, and reliable battery life without the need for continued maintenance.

41.     LiiON's new energy solutions also featured a major weight reduction and decrease in footprint, with robust levels of system communication and battery information, and eliminated the need for lead-acid battery replacement.

42.     Following the creation of this new technology, LiiON was the first globally recognized UL Certified Hi-Rate Discharge Lithium System for UPS applications.

43.　LiiON is recognized as the first to fully understand, build, and deliver a UL Certified system that meets and exceeds current Datacenter specifications and safety concerns.

44.　In January of 2013, LiiON had perfected the technology to provide a lithium-ion solution in the UPS/datacenter market, specifically, LiiON had developed the battery, cabinet, and order of operations necessary to allow LiiON's systems to succeed.

45.　LiiON created and employed its own proprietary software and source code containing proprietary algorithms to control the timing sequences for the high rate discharge and system efficiency.

46.　This proprietary software is controlled by LiiON's patented control module, which allows the user to interface with the software, gather data from it, but not access the algorithms, source code, or software engineering.

47.　LiiON's source code and algorithms for its proprietary software is fully encrypted with LiiON's unique and personal encryption to ensure that only LiiON may access the information and painstakingly collected date contained therein.

48.　On or about November 7, 2012, LiiON sent its first beta lithium ion UPS system to APC by Schneider Electric for testing under a mutual non-disclosure agreement.

49.　On or about May 31, 2013, LiiON sent a prototype lithium-ion battery cabinet to Defendant EMERSON, then known as Emerson Power Network or Emerson Network Power, as a sample of LiiON's product line.

50.　Plaintiff LiiON entered into a joint venture with Defendant EMERSON wherein the two corporations agreed to market and sell LiiON's technology to EMERSON customers.

51.　As part of that joint venture with EMERSON, the first test unit for the UPS cabinet arrived at Emerson the week of June 3, 2013.

52.     On or about June 25, 2013, Defendant EMERSON tested the received LiiON prototype.

53.     On or about September 10, 2013, Defendant EMERSON entered into a Non-Disclosure Agreement with Valence Technology, Inc., to advance their understanding of technologies and Valence's Lithium Phosphate UPS module and how it integrates with Liion's Stored Energy System technology.

54.     Representatives from Valence suggested that Defendant EMERSON, through its subsidiary Alber (now Liebert North America), work with LiiON to integrate communication and alarming of the lithium ion UPS systems, since LiiON was the industry lead for Valence in the lithium ion UPS market.

55.     On or about March 11, 2014, LiiON's representatives met with representatives of Defendant EMERSON and pitched a proposal to supply Defendant EMERSON with LiiON products and technology for sale and installation in Forsythe Data Centers, a customer of EMERSON.

56.     On or about March 11, 2014, LiiON's CEO, Gary Gray, met with Bill Campbell, Senior Project Manager, Power Systems, Liebert AC Power as well as Josh Scott (Procurement), John Polenz (Battery Service Tech Support), Larry Brazis (Product Engineering) and Shukri Mire (Application Engineering), and provided a power point overview of LiiON and its UPS LIB cabinet product plans, a copy of which was provided to Liebert. The focus of the meeting was on the LIB cabinet for the Forsythe data center in Chicago.  Gray also reviewed other LiiON LIB and VRLA product offerings.

57.     LiiON's technology and products would be integrated into Liebert battery cabinets, and then installed in Forsythe.

58.     At the March 11, 2014, meeting timetables were discussed, and further weekly conference calls and/or meetings were contemplated and set.

59.     The concept of the meeting was the pre-production cabinets for Forsythe to be available for shipment approximately July 1, 2014.

60.     On May 6, 2014, Liebert/Emerson authorized Gray to present Emerson as a leader in the industry, with LiiON's technology, for large footprint UPS and Datacenters at the 2014 Energy Battery Group Annual Meeting & Convention.

61.     On or about May 8, 2014, LiiON's principal, Gary Gray, spoke at the 2014 Energy Battery Group Annual Meeting & Convention announcing LiiON's newest lithium-ion technology and LiiON's upcoming collaboration with Defendant EMERSON.

62.     On or about July 31, 2014, LiiON entered into a Non-Disclosure Agreement with Defendant EMERSON to share LiiON technology and confidential information in an effort to facilitate a joint and mutually beneficial venture into the UPS market.  *See* Exhibit "A."

63.     As part of their Joint Venture, EMERSON executed with LiiON a Mutual Nondisclosure Agreement, dated July 31, 2014, to protect each other's confidential information, including, but, not limited to LiiON's trade secret information.

64.     As part of the roll out with Liebert, Plaintiff was forced to integrate its proprietary software and patent pending technology into Defendant EMERSON's system and UPS products.

65.     Plaintiff LiiON provided laptops and hard-drives to Defendant EMERSON, and instructed Defendant's representatives on the systems to ensure that Defendant EMERSON could trouble shoot and provide customer support to buyers.

66.     On or about December 1, 2014, LiiON transmitted a Master Business Unit Supply Agreement with Liebert North America, Inc., a division of Defendant EMERSON, for the purpose of buying and selling LiiON and EMERSON products between the two entities.

67.     That Master Business Unit Supply Agreement was not signed, however, the parties began acting under the terms of that agreement as if it had been executed.

68.     During 2015, LiiON and EMERSON began their pilot project and deployed lithium-ion battery UPS systems to Forsythe Data Centers for installation.

69.     During the period of 2014 to 2016, and specifically in January of 2016, Plaintiff LiiON shared certain trade secret information relating to the LiiON lithium-ion product parameters and technologies pursuant to the established NDA to employees of Defendant EMERSON, including but not limited to Kyle Keeper and Rick Caudill.

70.     On information and belief, Defendant EMERSON's employees, including but not limited to Kyle Keeper and Rick Caudill, disclosed the aforementioned confidential information and trade secrets to Defendant Vertiv Group Corporation prior to the sale of Emerson Network Power.

71.     On or about July of 2016, Defendant Emerson Electric Co. sold Emerson Network Power to Defendant Vertiv Group Corporation.

72.     Defendant Vertiv Group Corporation absorbed Emerson Network Power (ENP2) and converted it to Vertiv Corporation.

73.     Defendant VERTIV then assumed all of the assets of Emerson Network Power, including but not limited to the joint venture and agreements with LiiON.

74.     On or about August 18, 2016, Forsythe Data Centers was featured in an article by the Data Center Frontier website highlighting the introduction of lithium-ion UPS systems into Forsythe from Defendant VERTIV through its joint venture with LiiON.

75.     As of 2016, Plaintiff LiiON was the only company offering technology that would allow the lithium-ion battery UPS solutions to be cost-effective, while still providing high discharge rates in a safe and sustainable manner.

76.     On or about February 8, 2017, VERTIV announced that it would be providing lithium-ion battery solutions that could reduce replacement frequency, footprint, and total cost of ownership.

77.     This February 8, 2017, announcement was in reference to the LiiON technology, which VERTIV was utilizing in its UPS systems at that time.

78.     Upon information and belief, from 2014 to mid 2017, Samsung's existing lithium ion batteries begin overheating/short circuiting and catching fire.

79.     Upon information and belief, Samsung SDI and Schneider Electric began developing a UPS product in 2012/2013 that was unable to sufficiently regulate the efficiency, charge, discharge, and cooling from its lithium ion products.

80.     Upon information and belief, prior to 2017, neither Samsung SDI nor Vertiv's competition, Schneider Electric, promoted or presented information on Samsung SDI's BMS current controlled discharges.

81.     On or about April 20, 2017, Samsung SDI announced that it would be targeting the lithium ion battery UPS market, and indicated that it was providing lithium-ion batteries for UPS solutions to three global UPS manufacturers, Schneider Electric, Vertiv, and Eaton.

82. As of April 20, 2017, Samsung's products were unable to safely attain the same high discharge rates featured in LiiON's products.

83. Between February 8, 2017, and December 21, 2017, Defendant VERTIV purchased the LiiON UPS lithium ion system products through various purchase orders, including, but not limited to, Purchase Order numbers P22023517, P22023531, P22023580, P22023537, P22023335, P44023607, and P44023622.

84. The aforementioned purchase orders were valued at over $1,000,000.00.

85. On or about December 21, 2017, Defendant VERTIV cancelled all open purchase orders with LiiON, LLC, including those listed above and demanded that the $300,000.00 down payment be returned on the P22023517 order.

86. Plaintiff returned the down payment in the form of a credit against cancellation charges and/or debt in an effort to maintain the relationship with Defendant VERTIV. However, VERTIV breached its purchase order agreements with Plaintiff when it unilaterally canceled those orders without notice and was subject to cancellation charges.

87. On or about January 10, 2018, Defendant VERTIV announced expansion of its Lithium-ion UPS product line, and continued to sell products containing LiiON's proprietary and patented technology and trade secrets.

88. Since December 21, 2017, Defendant VERTIV has been marketing products with LiiON technology without paying LiiON royalties and without LiiON's permission.

89. On information and belief, since January of, 2017, Defendant VERTIV has been supplying Samsung and its subsidiaries with Plaintiff LiiON's proprietary technology, patents, pending patents, and other confidential information for use in Samsung's UPS products.

90.     To protect its intellectual property, LiiON has filed for patent and trademark protection when necessary, and also kept its processes and technology combinations secret.

91.     Any entity working with LiiON on its proprietary technology agreed and entered into a non-disclosure agreement prior to divulging any confidential information or sharing of technological secrets.

92.     LiiON's proprietary processes and combinations of technology are maintained as secret, with only those officers of LiiON, and any members of entities covered under the non-disclosure agreements having access or knowledge of those secrets.

93.     On or about March 10, 2018, Plaintiff LiiON, LLC, sent a Cease and Desist letter to Defendant VERTIV, which insisted that VERTIV stop using LiiON's proprietary technology and patents or pending patents, that it destroy or return all LiiON confidential information, and that VERTIV stop disclosing and otherwise misappropriating LiiON's trade secrets and proprietary technology.

94.     Since March 10, 2018, Defendant VERTIV persists in selling and using Plaintiff's trade secrets, patents, pending patents, and other confidential information.

95.     As a result of Defendant's VERTIV's breaches of contract, duty, and secrecy, Plaintiff LiiON has been irreparably damaged financially and in reputation, as Defendant VERTIV has continued to use LiiON's presentation materials and has further disparaged LiiON's reputation.

## COUNT I
## Violations of the Illinois Trade Secrets Act by
## Defendant VERTIV GROUP CORPORATION

1.95.   Plaintiffs reallege and incorporate by reference as if fully set forth herein Paragraphs 1 through 95.

96.     As set forth above, VERTIV have misappropriated and used Plaintiffs' Trade Secrets, including without limitation confidential information relating to LiiON's proprietary architecture design, proprietary software, control methodology, hardware configurations and equipment, business models, and total cost of ownership and return on investment configurators, along with LiiON patents and all of these methods, software, systems, and components operating together to form the basis of LiiON's lithium ion smart solutions (hereafter collectively as "LiiON's Trade Secrets").

97.     LiiON's Trade Secrets were sufficiently secret and maintained so that only LiiON's principal, Gary Gray was privy to each and every trade secret and their collective uses.

98.     LiiON's Trade Secrets were further limited so that any corporation, individual, or other entity doing business or otherwise working with LiiON was required to sign a Nondisclosure Agreement prior to any trade secrets or confidential information being divulged.

99.     Plaintiff LiiON's Trade Secrets are sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from their disclosure or use.

100.    Plaintiff has at all relevant times taken steps that are reasonable under the circumstances to maintain the secrecy and confidentiality of their Trade Secrets.

101.    Defendants VGC attained these trade secrets Plaintiff LiiON in violation of the Illinois Trade Secrets Act, and in breach of their Mutual Nondisclosure Agreement.

102.    Defendants VGC were fully aware that the information comprising LiiON's Trade Secrets were secret, confidential, and maintained in such a way as to prevent disclosure to third parties, and specifically competitors such as Samsung.

103.    VGC acquired Plaintiffs' Trade Secrets through improper means, including but not limited to VGC's violation of its duties and agreements with Plaintiff.

104.    Defendants VGC were aware of the mutual nondisclosure agreement between Vertiv and LiiON, and yet still misappropriated and divulged those trade secrets to Samsung, and others for use in Vertiv and Samsung products for substantial economic gain.

105.    Defendant VGC violated the Illinois Trade Secrets Act by and through the following acts and omissions:

   a.  Acquiring and studying Plaintiff LiiON's Trade Secrets;

   b.  Utilizing LiiON's Trade Secrets in Defendants Vertiv's products, equipment, and within its industry;

   c.  Divulging LiiON's Trade Secrets to Samsung;

   d.  Aiding Samsung in incorporating LiiON's Trade Secrets into Vertiv and Samsung products and goods.

   e.  Divulging LiiON's Trade Secrets to other third party persons and entities in order to incorporate and utilize LiiON's Trade Secrets in Defendant VERTIV's and Samsung's products; and

   f.  Otherwise inducing Samsung to utilize LiiON's Trade Secrets in violation of the Mutual Nondisclosure Agreement between LiiON and Vertiv.

106.    VGC's misappropriation of Plaintiffs' Trade Secrets has been willful and malicious.

107.    As a result of Defendant VGC's misappropriation of LiiON's Trade Secrets and its improper acts and omissions, Plaintiff LiiON has been damaged economically by way of

lost profits, lost trade secrets, lost prospective business relationships, and lost reputation in excess of $100,000,000.00.

WHEREFORE, Plaintiff, LIION, LLC, by and through its attorneys, Barney & Karamanis, LLP, respectfully prays for this Honorable Court to find in favor of Plaintiff and against Defendant VERTIV GROUP CORPORATION for violations of the Illinois Trade Secrets Act, including without limitation damages for Plaintiffs' actual loss and Defendants' unjust enrichment, and/or a reasonable royalty, in amounts to be determined at trial, for exemplary damages up to twice the amount of any damage award with interest, as provided in the Illinois Trade Secrets Act, for preliminary and permanent injunctions against Vertiv, their employees, agents, and representatives, and all those acting in concert with them, enjoining them from further acts of misappropriation, for attorney fees and costs pursuant to the Illinois Trade Secrets Act, and for such other and further relief as this Court deems just and proper.

## COUNT II
### Violations of the Defend Trade Secrets Act by Defendant VERTIV GROUP CORPORATION

1-107.  Plaintiffs reallege and incorporate by reference as if fully set forth herein Paragraphs 1 through 107.

108.    As set forth above, Vertiv have misappropriated and used Plaintiffs' Trade Secrets, including without limitation confidential information relating to LiiON's proprietary architecture design, proprietary software, control methodology, hardware configurations and equipment, business models, and total cost of ownership and return on investment configurators, along with LiiON patents and all of these methods, software, systems, and components operating together to form the basis of LiiON's lithium ion smart solutions (hereafter collectively referred to as "LiiON's Trade Secrets").

109.     LiiON's Trade Secrets were sufficiently secret and maintained so that only LiiON's principal, Gary Gray was privy to each and every trade secret and their collective uses.

110.     LiiON's Trade Secrets were further limited so that any corporation, individual, or other entity doing business or otherwise working with LiiON was required to sign a Nondisclosure Agreement prior to any trade secrets or confidential information being divulged.

111.     Plaintiff LiiON's Trade Secrets are sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from their disclosure or use.

112.     Plaintiff has at all relevant times taken steps that are reasonable under the circumstances to maintain the secrecy and confidentiality of their Trade Secrets.

113.     Defendant VGC attained these trade secrets Plaintiff LiiON in violation of the Defend Trade Secrets Act, and in breach of their Mutual Nondisclosure Agreement.

114.     Defendant VGC were fully aware that the information comprising LiiON's Trade Secrets were secret, confidential, and maintained in such a way as to prevent disclosure to third parties, and specifically competitors such as Samsung.

115.     VGC acquired Plaintiffs' Trade Secrets through improper means, including but not limited to Vertiv's violation of its duties and agreements with Plaintiff.

116.     Defendant VGC were aware of the mutual nondisclosure agreement between Vertiv and LiiON, and yet still misappropriated and divulged those trade secrets to Samsung, and others for use in Vertiv and Samsung products for substantial economic gain.

117.    Defendant VGC violated the Defend Trade Secrets Act by and through the following acts and omissions:

       a.    Acquiring and studying Plaintiff LiiON's Trade Secrets;

       b.    Utilizing LiiON's Trade Secrets in Defendants Vertiv's products, equipment, and within its industry;

       c.    Divulging LiiON's Trade Secrets to Samsung;

       d.    Aiding Samsung in incorporating LiiON's Trade Secrets into Vertiv and Samsung products and goods.

       e.    Divulging LiiON's Trade Secrets to other third party persons and entities in order to incorporate and utilize LiiON's Trade Secrets in Defendant VERTIV's and Samsung's products; and

       f.    Otherwise inducing Samsung to utilize LiiON's Trade Secrets in violation of the Mutual Nondisclosure Agreement between LiiON and Vertiv.

118.    VGC's misappropriation of Plaintiffs' Trade Secrets has been willful and malicious.

119.    As a result of Defendant VGC's misappropriation of LiiON's Trade Secrets and its improper acts and omissions, Plaintiff LiiON has been damaged economically by way of lost profits, lost trade secrets, lost prospective business relationships, and lost reputation in excess of $100,000,000.00.

WHEREFORE, Plaintiff, LIION, LLC, by and through its attorneys, Barney & Karamanis, LLP, respectfully prays for this Honorable Court to find in favor of Plaintiff and against Defendant VERTIV GROUP CORPORATION for violations of the Illinois Trade Secrets Act, including without limitation damages for Plaintiffs' actual loss and Defendants' unjust enrichment, and/or a reasonable royalty, in amounts to be determined at trial, for exemplary damages up to twice the amount of any damage award with interest, as provided in the Illinois Trade Secrets Act, for preliminary and permanent injunctions against Vertiv, their

employees, agents, and representatives, and all those acting in concert with them, enjoining them from further acts of misappropriation, for attorney fees and costs pursuant to the Illinois Trade Secrets Act, and for such other and further relief as this Court deems just and proper.

**COUNT III**
**Violations of the Illinois Trade Secrets Act by**
**Defendant VERTIV CORPORATION, f/k/a Liebert Corporation**

1-119. Plaintiffs reallege and incorporate by reference as if fully set forth herein Paragraphs 1 through 119.

120. As set forth above, Defendant VERTIV has misappropriated and used Plaintiffs' Trade Secrets, including without limitation confidential information relating to LiiON's proprietary architecture design, proprietary software, control methodology, hardware configurations and equipment, business models, and total cost of ownership and return on investment configurators, along with LiiON patents and all of these methods, software, systems, and components operating together to form the basis of LiiON's lithium ion smart solutions.

121. LiiON's Trade Secrets were sufficiently secret and maintained so that only LiiON's principal, Gary Gray was privy to each and every trade secret and their collective uses.

122. LiiON's Trade Secrets were further limited so that any corporation, individual, or other entity doing business or otherwise working with LiiON was required to sign a Nondisclosure Agreement prior to any trade secrets or confidential information being divulged.

123.    Plaintiff LiiON's Trade Secrets are sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from their disclosure or use.

124.    Plaintiff has at all relevant times taken steps that are reasonable under the circumstances to maintain the secrecy and confidentiality of their Trade Secrets.

125.    Defendant Liebert attained these trade secrets Plaintiff LiiON in violation of the Illinois Trade Secrets Act, and in breach of their Mutual Nondisclosure Agreement.

126.    Defendant Liebert were fully aware that the information comprising LiiON's Trade Secrets were secret, confidential, and maintained in such a way as to prevent disclosure to third parties, and specifically competitors such as Samsung.

127.    Liebert acquired Plaintiffs' Trade Secrets through improper means, including but not limited to Vertiv's violation of its duties and agreements with Plaintiff.

128.    Defendant Liebert were aware of the mutual nondisclosure agreement between Vertiv and LiiON, and yet still misappropriated and divulged those trade secrets to Samsung, and others for use in Vertiv and Samsung products for substantial economic gain.

129.    Defendant Liebert violated the Illinois Trade Secrets Act by and through the following acts and omissions:

g.  Acquiring and studying Plaintiff LiiON's Trade Secrets;

h.  Utilizing LiiON's Trade Secrets in Defendants Vertiv's products, equipment, and within its industry;

i.  Divulging LiiON's Trade Secrets to Samsung;

j.  Aiding Samsung in incorporating LiiON's Trade Secrets into Vertiv and Samsung products and goods.

k. Divulging LiiON's Trade Secrets to other third party persons and entities in order to incorporate and utilize LiiON's Trade Secrets in Defendant VERTIV's and Samsung's products; and

l. Otherwise inducing Samsung to utilize LiiON's Trade Secrets in violation of the Mutual Nondisclosure Agreement between LiiON and Vertiv.

130.    Liebert 's misappropriation of Plaintiffs' Trade Secrets has been willful and malicious.

131.    As a result of Defendant Liebert's misappropriation of LiiON's Trade Secrets and its improper acts and omissions, Plaintiff LiiON has been damaged economically by way of lost profits, lost trade secrets, lost prospective business relationships, and lost reputation in excess of $100,000,000.00.

WHEREFORE, Plaintiff, LIION, LLC, by and through its attorneys, Barney & Karamanis, LLP, respectfully prays for this Honorable Court to find in favor of Plaintiff and against Defendant VERTIV CORPORATION, f/k/a Liebert Corporation for violations of the Illinois Trade Secrets Act, including without limitation damages for Plaintiffs' actual loss and Defendants' unjust enrichment, and/or a reasonable royalty, in amounts to be determined at trial, for exemplary damages up to twice the amount of any damage award with interest, as provided in the Illinois Trade Secrets Act, for preliminary and permanent injunctions against Vertiv, their employees, agents, and representatives, and all those acting in concert with them, enjoining them from further acts of misappropriation, for attorney fees and costs pursuant to the Illinois Trade Secrets Act, and for such other and further relief as this Court deems just and proper.

<div align="center">

**COUNT IV**
**Violations of the Defend Trade Secrets Act by**
**Defendant VERTIV CORPORATION, f/k/a Liebert Corporation**

</div>

1-131.  Plaintiffs reallege and incorporate by reference as if fully set forth herein Paragraphs 1 through 131.

132.    As set forth above, VERTIV have misappropriated and used Plaintiffs' Trade Secrets, including without limitation confidential information relating to LiiON's proprietary architecture design, proprietary software, control methodology, hardware configurations and equipment, business models, and total cost of ownership and return on investment configurators, along with LiiON patents and all of these methods, software, systems, and components operating together to form the basis of LiiON's lithium ion smart solutions.

133.    LiiON's Trade Secrets were sufficiently secret and maintained so that only LiiON's principal, Gary Gray was privy to each and every trade secret and their collective uses.

134.    LiiON's Trade Secrets were further limited so that any corporation, individual, or other entity doing business or otherwise working with LiiON was required to sign a Nondisclosure Agreement prior to any trade secrets or confidential information being divulged.

135.    Plaintiff LiiON's Trade Secrets are sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from their disclosure or use.

136.    Plaintiff has at all relevant times taken steps that are reasonable under the circumstances to maintain the secrecy and confidentiality of their Trade Secrets.

137.    Defendant Liebert attained these trade secrets Plaintiff LiiON in violation of the Defend Trade Secrets Act, and in breach of their Mutual Nondisclosure Agreement.

138.    Defendant Liebert were fully aware that the information comprising LiiON's Trade Secrets were secret, confidential, and maintained in such a way as to prevent disclosure to third parties, and specifically competitors such as Samsung.

139.    Liebert acquired Plaintiffs' Trade Secrets through improper means, including but not limited to Vertiv's violation of its duties and agreements with Plaintiff.

140.    Defendant Liebert were aware of the mutual nondisclosure agreement between Vertiv and LiiON, and yet still misappropriated and divulged those trade secrets to Samsung, and others for use in Vertiv and Samsung products for substantial economic gain.

141.    Defendant Liebert violated the Defend Trade Secrets Act by and through the following acts and omissions:

g.    Acquiring and studying Plaintiff LiiON's Trade Secrets;

h.    Utilizing LiiON's Trade Secrets in Defendants Vertiv's products, equipment, and within its industry;

i.    Divulging LiiON's Trade Secrets to Samsung;

j.    Aiding Samsung in incorporating LiiON's Trade Secrets into Vertiv and Samsung products and goods.

k.    Divulging LiiON's Trade Secrets to other third party persons and entities in order to incorporate and utilize LiiON's Trade Secrets in Defendant VERTIV's and Samsung's products; and

l.    Otherwise inducing Samsung to utilize LiiON's Trade Secrets in violation of the Mutual Nondisclosure Agreement between LiiON and Vertiv.

142.    Liebert's misappropriation of Plaintiffs' Trade Secrets has been willful and malicious.

143.    As a result of Defendant Liebert's misappropriation of LiiON's Trade Secrets and its improper acts and omissions, Plaintiff LiiON has been damaged economically by way

of lost profits, lost trade secrets, lost prospective business relationships, and lost reputation in excess of $100,000,000.00.

WHEREFORE, Plaintiff, LIION, LLC, by and through its attorneys, Barney & Karamanis, LLP, respectfully prays for this Honorable Court to find in favor of Plaintiff and against Defendant VERTIV GROUP CORPORATION, VERTIV CORPORATION, f/k/a Liebert Corporation, EECO, INC., and EMERSON ELECTRIC CO. for violations of the Illinois Trade Secrets Act, including without limitation damages for Plaintiffs' actual loss and Defendants' unjust enrichment, and/or a reasonable royalty, in amounts to be determined at trial, for exemplary damages up to twice the amount of any damage award with interest, as provided in the Illinois Trade Secrets Act, for preliminary and permanent injunctions against Vertiv, their employees, agents, and representatives, and all those acting in concert with them, enjoining them from further acts of misappropriation, for attorney fees and costs pursuant to the Illinois Trade Secrets Act, and for such other and further relief as this Court deems just and proper.

## COUNT V
### Violations of the Illinois Trade Secrets Act by
### Defendant EECO, INC. and Emerson Network Power (ENP1)

1-143.   Plaintiffs reallege and incorporate by reference as if fully set forth herein Paragraphs 1 through 143.

144.    As set forth above, EMERSON have misappropriated and used Plaintiffs' Trade Secrets, including without limitation confidential information relating to LiiON's proprietary architecture design, proprietary software, control methodology, hardware configurations and equipment, business models, and total cost of ownership and return on investment configurators, along with LiiON patents and all of these methods, software,

24

systems, and components operating together to form the basis of LiiON's lithium ion smart solutions.

145.    LiiON's Trade Secrets were sufficiently secret and maintained so that only LiiON's principal, Gary Gray was privy to each and every trade secret and their collective uses.

146.    LiiON's Trade Secrets were further limited so that any corporation, individual, or other entity doing business or otherwise working with LiiON was required to sign a Nondisclosure Agreement prior to any trade secrets or confidential information being divulged.

147.    Plaintiff LiiON's Trade Secrets are sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from their disclosure or use.

148.    Plaintiff has at all relevant times taken steps that are reasonable under the circumstances to maintain the secrecy and confidentiality of their Trade Secrets.

149.    Defendants EECO and Emerson Network Power attained these trade secrets Plaintiff LiiON in violation of the Illinois Trade Secrets Act, and in breach of their Mutual Nondisclosure Agreement.

150.    Defendants EECO and Emerson Network Power were fully aware that the information comprising LiiON's Trade Secrets were secret, confidential, and maintained in such a way as to prevent disclosure to third parties, and specifically competitors such as Samsung.

151. EECO and Emerson Network Power acquired Plaintiffs' Trade Secrets through improper means, including but not limited to Vertiv's violation of its duties and agreements with Plaintiff.

152. Defendants EECO and Emerson Network Power were aware of the mutual nondisclosure agreement between Vertiv and LiiON, and yet still misappropriated and divulged those trade secrets to Samsung, and others for use in Vertiv and Samsung products for substantial economic gain.

153. Defendants EECO and Emerson Network Power violated the Illinois Trade Secrets Act by and through the following acts and omissions:

   a. Acquiring and studying Plaintiff LiiON's Trade Secrets;

   b. Divulging LiiON's Trade Secrets to Defendant Vertiv Group Corporation;

   c. Aiding Defendant VERTIV in incorporating LiiON's Trade Secrets into Vertiv and Samsung products and goods.

   d. Divulging LiiON's Trade Secrets to other third party persons and entities in order to incorporate and utilize LiiON's Trade Secrets in Defendant VERTIV's and Samsung's products; and

   e. Otherwise inducing VERTIV to utilize LiiON's Trade Secrets in violation of the Mutual Nondisclosure Agreement between LiiON and EMERSON.

154. EECO's and Emerson Network Power's misappropriation of Plaintiffs' Trade Secrets has been willful and malicious.

155. As a result of Defendants EECO's and Emerson Network Power's misappropriation of LiiON's Trade Secrets and its improper acts and omissions, Plaintiff LiiON has been damaged economically by way of lost profits, lost trade secrets, lost prospective business relationships, and lost reputation in excess of $100,000,000.00.

WHEREFORE, Plaintiff, LIION, LLC, by and through its attorneys, Barney & Karamanis, LLP, respectfully prays for this Honorable Court to find in favor of Plaintiff and against Defendant EECO, INC. and Defendant Emerson Network Power (ENP1) for violations of the Illinois Trade Secrets Act, including without limitation damages for Plaintiffs' actual loss and Defendants' unjust enrichment, and/or a reasonable royalty, in amounts to be determined at trial, for exemplary damages up to twice the amount of any damage award with interest, as provided in the Illinois Trade Secrets Act, for preliminary and permanent injunctions against VERTIV, their employees, agents, and representatives, and all those acting in concert with them, and EMERSON, their employees, agents, and representatives, and all those acting in concert with them, enjoining them from further acts of misappropriation, for attorney fees and costs pursuant to the Illinois Trade Secrets Act, and for such other and further relief as this Court deems just and proper.

## COUNT VI
### Violations of the Defend Trade Secrets Act by Defendants EECO, INC. and Emerson Network Power

1-155.  Plaintiffs reallege and incorporate by reference as if fully set forth herein Paragraphs 1 through 155.

156.    As set forth above, EMERSON have misappropriated and used Plaintiffs' Trade Secrets, including without limitation confidential information relating to LiiON's proprietary architecture design, proprietary software, control methodology, hardware configurations and equipment, business models, and total cost of ownership and return on investment configurators, along with LiiON patents and all of these methods, software, systems, and components operating together to form the basis of LiiON's lithium ion smart solutions.

157.   LiiON's Trade Secrets were sufficiently secret and maintained so that only LiiON's principal, Gary Gray was privy to each and every trade secret and their collective uses.

158.   LiiON's Trade Secrets were further limited so that any corporation, individual, or other entity doing business or otherwise working with LiiON was required to sign a Nondisclosure Agreement prior to any trade secrets or confidential information being divulged.

159.   Plaintiff LiiON's Trade Secrets are sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from their disclosure or use.

160.   Plaintiff has at all relevant times taken steps that are reasonable under the circumstances to maintain the secrecy and confidentiality of their Trade Secrets.

161.   Defendants EECO and Emerson Network Power attained these trade secrets Plaintiff LiiON in violation of the Defend Trade Secrets Act, and in breach of their Mutual Nondisclosure Agreement.

162.   Defendants EECO and Emerson Network Power were fully aware that the information comprising LiiON's Trade Secrets were secret, confidential, and maintained in such a way as to prevent disclosure to third parties, and specifically competitors such as Samsung.

163.   Defendants EECO and Emerson Network Power acquired Plaintiffs' Trade Secrets through improper means, including but not limited to EMERSON's violation of its duties and agreements with Plaintiff.

164.    Defendants EECO and Emerson Network Power were aware of the mutual nondisclosure agreement between Vertiv and LiiON, and yet still misappropriated and divulged those trade secrets to VERTIV, and others for use in Vertiv and Samsung products for substantial economic gain.

165.    Defendants EECO and Emerson Network Power violated the Defend Trade Secrets Act by and through the following acts and omissions:

    a.    Acquiring and studying Plaintiff LiiON's Trade Secrets;

    b.    Divulging LiiON's Trade Secrets to Defendant Vertiv Group Corporation;

    c.    Aiding Defendant VERTIV in incorporating LiiON's Trade Secrets into Vertiv and Samsung products and goods.

    d.    Divulging LiiON's Trade Secrets to other third party persons and entities in order to incorporate and utilize LiiON's Trade Secrets in Defendant VERTIV's and Samsung's products; and

    e.    Otherwise inducing VERTIV to utilize LiiON's Trade Secrets in violation of the Mutual Nondisclosure Agreement between LiiON and EMERSON.

166.    Defendants EECO's and Emerson Network Power's misappropriation of Plaintiffs' Trade Secrets has been willful and malicious.

167.    As a result of Defendants EECO's and Emerson Network Power's misappropriation of LiiON's Trade Secrets and its improper acts and omissions, Plaintiff LiiON has been damaged economically by way of lost profits, lost trade secrets, lost prospective business relationships, and lost reputation in excess of $100,000,000.00.

WHEREFORE, Plaintiff, LIION, LLC, by and through its attorneys, Barney & Karamanis, LLP, respectfully prays for this Honorable Court to find in favor of Plaintiff and against Defendant EECO, INC. and Defendant Emerson Network Power (ENP1) for violations of the Illinois Trade Secrets Act, including without limitation damages for Plaintiffs' actual

loss and Defendants' unjust enrichment, and/or a reasonable royalty, in amounts to be determined at trial, for exemplary damages up to twice the amount of any damage award with interest, as provided in the Illinois Trade Secrets Act, for preliminary and permanent injunctions against VERTIV, their employees, agents, and representatives, and all those acting in concert with them, and EMERSON, their employees, agents, and representatives, and all those acting in concert with them, enjoining them from further acts of misappropriation, for attorney fees and costs pursuant to the Illinois Trade Secrets Act, and for such other and further relief as this Court deems just and proper.

<div align="center">

**COUNT VII**
**Violations of the Illinois Trade Secrets Act by**
**Defendant Emerson Electric Co.**

</div>

1-167.  Plaintiffs reallege and incorporate by reference as if fully set forth herein Paragraphs 1 through 167.

168.  As set forth above, EMERSON have misappropriated and used Plaintiffs' Trade Secrets, including without limitation confidential information relating to LiiON's proprietary architecture design, proprietary software, control methodology, hardware configurations and equipment, business models, and total cost of ownership and return on investment configurators, along with LiiON patents and all of these methods, software, systems, and components operating together to form the basis of LiiON's lithium ion smart solutions.

169.  LiiON's Trade Secrets were sufficiently secret and maintained so that only LiiON's principal, Gary Gray was privy to each and every trade secret and their collective uses.

170.    LiiON's Trade Secrets were further limited so that any corporation, individual, or other entity doing business or otherwise working with LiiON was required to sign a Nondisclosure Agreement prior to any trade secrets or confidential information being divulged.

171.    Plaintiff LiiON's Trade Secrets are sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from their disclosure or use.

172.    Plaintiff has at all relevant times taken steps that are reasonable under the circumstances to maintain the secrecy and confidentiality of their Trade Secrets.

173.    Defendants Emerson Electric attained these trade secrets Plaintiff LiiON in violation of the Illinois Trade Secrets Act, and in breach of their Mutual Nondisclosure Agreement.

174.    Defendants Emerson Electric were fully aware that the information comprising LiiON's Trade Secrets were secret, confidential, and maintained in such a way as to prevent disclosure to third parties, and specifically competitors such as Samsung.

175.    Emerson Electric acquired Plaintiffs' Trade Secrets through improper means, including but not limited to EMERSON's violation of its duties and agreements with Plaintiff.

176.    Defendant Emerson Electric was aware of the mutual nondisclosure agreement between EMERSON and LiiON, and yet still misappropriated and divulged those trade secrets to VERTIV, and others for use in Vertiv and Samsung products for substantial economic gain.

31

177.    Defendant Emerson violated the Illinois Trade Secrets Act by and through the following acts and omissions:

     a.    Acquiring and studying Plaintiff LiiON's Trade Secrets;

     b.    Divulging LiiON's Trade Secrets to Defendant Vertiv Group Corporation;

     c.    Aiding Defendant VERTIV in incorporating LiiON's Trade Secrets into Vertiv and Samsung products and goods.

     d.    Divulging LiiON's Trade Secrets to other third party persons and entities in order to incorporate and utilize LiiON's Trade Secrets in Defendant VERTIV's and Samsung's products; and

     e.    Otherwise inducing VERTIV to utilize LiiON's Trade Secrets in violation of the Mutual Nondisclosure Agreement between LiiON and EMERSON.

178.    Emerson Electric's misappropriation of Plaintiffs' Trade Secrets has been willful and malicious.

179.    As a result of Defendant Emerson Electric's misappropriation of LiiON's Trade Secrets and its improper acts and omissions, Plaintiff LiiON has been damaged economically by way of lost profits, lost trade secrets, lost prospective business relationships, and lost reputation in excess of $100,000,000.00.

WHEREFORE, Plaintiff, LIION, LLC, by and through its attorneys, Barney & Karamanis, LLP, respectfully prays for this Honorable Court to find in favor of Plaintiff and against Defendant EMERSON ELECTRONIC CO. for violations of the Illinois Trade Secrets Act, including without limitation damages for Plaintiffs' actual loss and Defendants' unjust enrichment, and/or a reasonable royalty, in amounts to be determined at trial, for exemplary damages up to twice the amount of any damage award with interest, as provided in the Illinois Trade Secrets Act, for preliminary and permanent injunctions against VERTIV, their employees, agents, and representatives, and all those acting in concert with them, and EMERSON, their

employees, agents, and representatives, and all those acting in concert with them, enjoining them from further acts of misappropriation, for attorney fees and costs pursuant to the Illinois Trade Secrets Act, and for such other and further relief as this Court deems just and proper.

## COUNT VIII
### Violations of the Defend Trade Secrets Act by
### Defendant Emerson Electric Co.

1-179.  Plaintiffs reallege and incorporate by reference as if fully set forth herein Paragraphs 1 through 179.

180.    As set forth above, EMERSON have misappropriated and used Plaintiffs' Trade Secrets, including without limitation confidential information relating to LiiON's proprietary architecture design, proprietary software, control methodology, hardware configurations and equipment, business models, and total cost of ownership and return on investment configurators, along with LiiON patents and all of these methods, software, systems, and components operating together to form the basis of LiiON's lithium ion smart solutions.

181.    LiiON's Trade Secrets were sufficiently secret and maintained so that only LiiON's principal, Gary Gray was privy to each and every trade secret and their collective uses.

182.    LiiON's Trade Secrets were further limited so that any corporation, individual, or other entity doing business or otherwise working with LiiON was required to sign a Nondisclosure Agreement prior to any trade secrets or confidential information being divulged.

183. Plaintiff LiiON's Trade Secrets are sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from their disclosure or use.

184. Plaintiff has at all relevant times taken steps that are reasonable under the circumstances to maintain the secrecy and confidentiality of their Trade Secrets.

185. Defendant Emerson Electric attained these trade secrets Plaintiff LiiON in violation of the Defend Trade Secrets Act, and in breach of their Mutual Nondisclosure Agreement.

186. Defendant Emerson Electric was fully aware that the information comprising LiiON's Trade Secrets were secret, confidential, and maintained in such a way as to prevent disclosure to third parties, and specifically competitors such as VERTIV.

187. Emerson acquired Plaintiffs' Trade Secrets through improper means, including but not limited to EMERSON's violation of its duties and agreements with Plaintiff.

188. Defendant Emerson Electric was aware of the mutual nondisclosure agreement between EMERSON and LiiON, and yet still misappropriated and divulged those trade secrets to VERTIV, and others for use in Vertiv and Samsung products for substantial economic gain.

189. Defendant Emerson violated the Defend Trade Secrets Act by and through the following acts and omissions:

   a. Acquiring and studying Plaintiff LiiON's Trade Secrets;

   b. Divulging LiiON's Trade Secrets to Defendant Vertiv Group Corporation;

   c. Aiding Defendant VERTIV in incorporating LiiON's Trade Secrets into Vertiv and Samsung products and goods.

     d.   Divulging LiiON's Trade Secrets to other third party persons and entities in order to incorporate and utilize LiiON's Trade Secrets in Defendant VERTIV's and Samsung's products; and

     e.   Otherwise inducing VERTIV to utilize LiiON's Trade Secrets in violation of the Mutual Nondisclosure Agreement between LiiON and EMERSON.

190.    Emerson Electric's misappropriation of Plaintiffs' Trade Secrets has been willful and malicious.

191.    As a result of Defendant Emerson Electric's misappropriation of LiiON's Trade Secrets and its improper acts and omissions, Plaintiff LiiON has been damaged economically by way of lost profits, lost trade secrets, lost prospective business relationships, and lost reputation in excess of $100,000,000.00.

WHEREFORE, Plaintiff, LIION, LLC, by and through its attorneys, Barney & Karamanis, LLP, respectfully prays for this Honorable Court to find in favor of Plaintiff and against Defendant EMERSON ELECTRONIC CO. for violations of the Illinois Trade Secrets Act, including without limitation damages for Plaintiffs' actual loss and Defendants' unjust enrichment, and/or a reasonable royalty, in amounts to be determined at trial, for exemplary damages up to twice the amount of any damage award with interest, as provided in the Illinois Trade Secrets Act, for preliminary and permanent injunctions against VERTIV, their employees, agents, and representatives, and all those acting in concert with them, and EMERSON, their employees, agents, and representatives, and all those acting in concert with them, enjoining them from further acts of misappropriation, for attorney fees and costs pursuant to the Illinois Trade Secrets Act, and for such other and further relief as this Court deems just and proper.

## **COUNT IX**

## **Breach of Contract against VERTIV CORPORATION**

1-191. Plaintiff realleges and incorporate paragraphs 1-191 of this Complaint as and for paragraph 1-191 as if fully set forth herein.

192.    Plaintiffs entered into a valid and enforceable contract with Defendant Vertiv Corporation ("Liebert") on or about July 31, 2014.  *See,* Exhibit "A."

193.    Plaintiff fully performed upon their obligations under that agreement.

194.    Defendant Liebert breached that Agreement through the following acts and omissions:

    a.   Acquiring and studying Plaintiff LiiON's Trade Secrets;

    b.   Utilizing LiiON's Trade Secrets in Defendants Vertiv's products, equipment, and within its industry;

    c.   Divulging LiiON's Trade Secrets to Samsung;

    d.   Aiding Samsung in incorporating LiiON's Trade Secrets into Vertiv and Samsung products and goods.

    e.   Divulging LiiON's Trade Secrets to other third party persons and entities in order to incorporate and utilize LiiON's Trade Secrets in Defendant VERTIV's and Samsung's products; and

    f.   Otherwise inducing Samsung to utilize LiiON's Trade Secrets in violation of the Mutual Nondisclosure Agreement between LiiON and Vertiv.

195.    As the direct and proximate cause of Defendant Liebert's breach, Plaintiff has been damaged in the amount in excess of $100,000,000.00 for the lost Investment funds, and an amount yet to be determined for the lost opportunity to invest and interest on those Investment Funds.

WHEREFORE, Plaintiff, LIION, LLC, by and through its attorneys, Barney & Karamanis, LLP, respectfully prays for this Honorable Court to find in favor of Plaintiff and against Defendant VERTIV GROUP CORPORATION, VERTIV CORPORATION, f/k/a Liebert Corporation, EECO, INC., and EMERSON ELECTRIC CO. for violations of the Illinois

Trade Secrets Act, including without limitation damages for Plaintiffs' actual loss and Defendants' unjust enrichment, and/or a reasonable royalty, in amounts to be determined at trial, for exemplary damages up to twice the amount of any damage award with interest, as provided in the Illinois Trade Secrets Act, for preliminary and permanent injunctions against Vertiv, their employees, agents, and representatives, and all those acting in concert with them, enjoining them from further acts of misappropriation, for attorney fees and costs pursuant to the Illinois Trade Secrets Act, and for such other and further relief as this Court deems just and proper.

## COUNT X
## Breach of Contract by Defendant
## VERTIV GROUP CORPORATION

1-195.  Plaintiffs reallege and incorporate by reference as if fully set forth herein Paragraphs 1 through 195.

196.    On or about July 31, 2014, Plaintiff, LiiON, LLC, and Defendant Vertiv Corporation, f/k/a Liebert Corporation entered into and executed a Mutual Nondisclosure Agreement.  *See* Exhibit "A."

197.     That Mutual Nondisclosure Agreement also bound all entities and agents within the Emerson Power Network, which is now known as Defendant Vertiv Group Corporation.

198.    As part of the terms of this Mutual Nondisclosure Agreement, the Parties agreed to maintain one another's trade secrets in perpetuity.  *See* Exhibit "A" at ¶2.

199.    Defendant Vertiv Group Corporation breached that agreement through the following acts and omissions:

  a.  Acquiring and studying Plaintiff LiiON's Trade Secrets;

  b.  Utilizing LiiON's Trade Secrets in Defendants Vertiv's products, equipment, and within its industry;

    c.   Divulging LiiON's Trade Secrets to Samsung;

    d.   Aiding Samsung in incorporating LiiON's Trade Secrets into Vertiv and Samsung products and goods.

    e.   Divulging LiiON's Trade Secrets to other third party persons and entities in order to incorporate and utilize LiiON's Trade Secrets in Defendant VERTIV's and Samsung's products; and

    f.   Otherwise inducing Samsung to utilize LiiON's Trade Secrets in violation of the Mutual Nondisclosure Agreement between LiiON and Vertiv.

200. As the direct and proximate cause of Defendant Vertiv Group Corporation's breach, Plaintiff has been damaged in the amount in excess of $100,000,000.00 for the lost Investment funds, and an amount yet to be determined for the lost opportunity to invest and interest on those Investment Funds.

WHEREFORE, Plaintiff, LIION, LLC, by and through its attorneys, Barney & Karamanis, LLP, respectfully prays for this Honorable Court to find in favor of Plaintiff and against Defendant VERTIV GROUP CORPORATION, VERTIV CORPORATION, f/k/a Liebert Corporation, EECO, INC., and EMERSON ELECTRIC CO. for breach of contract resulting from and in addition to violations of the Illinois Trade Secrets Act, including without limitation damages for Plaintiffs' actual loss and Defendants' unjust enrichment, and/or a reasonable royalty, in amounts to be determined at trial, for exemplary damages up to twice the amount of any damage award with interest, as provided in the Illinois Trade Secrets Act, for preliminary and permanent injunctions against Vertiv, their employees, agents, and representatives, and all those acting in concert with them, enjoining them from further acts of misappropriation, for attorney fees and costs pursuant to the Illinois Trade Secrets Act, and for such other and further relief as this Court deems just and proper.

## COUNT XI

### Breach of Contract against Defendants

### Emerson Network Power (ENP1) and Emerson Electric Co.

1-200.  Plaintiff realleges and incorporate paragraphs 1-200 of this Complaint as and for paragraph 1-200 of this Count XI as if fully set forth herein.

201.    Plaintiffs entered into a valid and enforceable contract with Defendant Emerson Network Power / Emerson Electric Co. on or about July 31, 2014.  *See,* Exhibit "A."

202.    Plaintiff fully performed upon their obligations under that agreement.

203.    Defendants ENP1 and Emerson Electric breached that Agreement through the following acts and omissions:

     a.  Acquiring and studying Plaintiff LiiON's Trade Secrets;

     b.  Divulging LiiON's Trade Secrets to Defendant Vertiv Group Corporation;

     c.  Aiding Defendant VERTIV in incorporating LiiON's Trade Secrets into Vertiv and Samsung products and goods.

     d.  Divulging LiiON's Trade Secrets to other third party persons and entities in order to incorporate and utilize LiiON's Trade Secrets in Defendant VERTIV's and Samsung's products; and

     e.  Otherwise inducing VERTIV to utilize LiiON's Trade Secrets in violation of the Mutual Nondisclosure Agreement between LiiON and EMERSON.

204.    As the direct and proximate cause of Defendant ENP1's and Emerson Electric's breach, Plaintiff has been damaged in the amount in excess of $100,000,000.00 for the lost Investment funds, and an amount yet to be determined for the lost opportunity to invest and interest on those Investment Funds.

WHEREFORE, Plaintiff, LIION, LLC, by and through its attorneys, Barney & Karamanis, LLP, respectfully prays for this Honorable Court to find in favor of Plaintiff and

against Defendant Emerson Network Power and EMERSON ELECTRIC CO. for violations of the Illinois Trade Secrets Act, including without limitation damages for Plaintiffs' actual loss and Defendants' unjust enrichment, and/or a reasonable royalty, in amounts to be determined at trial, for exemplary damages up to twice the amount of any damage award with interest, as provided in the Illinois Trade Secrets Act, for preliminary and permanent injunctions against VERTIV their employees, agents, and representatives, and all those acting in concert with them, and EMERSON, their employees, agents, and representatives, and all those acting in concert with them, enjoining them from further acts of misappropriation, for attorney fees and costs pursuant to the Illinois Trade Secrets Act, and for such other and further relief as this Court deems just and proper.

<div style="margin-left: 50%;">

Respectfully submitted,

**LIION, LLC**

By: /s/ James A. Karamanis
    One of its Attorneys

</div>

James A. Karamanis (ARDC #6203479)
Barney & Karamanis, LLP
Two Prudential Plaza
180 N. Stetson, Ste 3050
Chicago, Illinois 60601
Tel.:  312/553-5300
**james@bkchicagolaw.com**

.

# EXHIBIT

## "A"

## MUTUAL NONDISCLOSURE AGREEMENT

This Mutual Nondisclosure Agreement (the "NDA") is entered into as of the 31st day of July 2014 (the "Effective Date") by and between LiiON, LLC ("Company") and **Liebert Corporation**, a business in the Emerson Network Power platform (such business is referred to in this Agreement as "ENP"). ENP and the Company are referred to herein individually as a "Party," or collectively, as the "Parties."

1. **Definitions**. For purposes of this NDA, the following terms have the definitions described below:

A. "Confidential Information" means any information of a Party disclosed by or on behalf of such Party to the other Party or its Representatives (as defined below), whether disclosed in writing, electronically, orally, or visually, concerning the disclosing Party's business and/or operations including products and services (including plans, roadmaps, techniques, methodologies, practices, knowledge bases, samples, equipment, demonstration or evaluation materials or units), research and development activity, intellectual property (including trade secrets, know-how, flow charts, processes, algorithms, formulas, ideas, strategies, inventions, designs, drawings, patents and patent applications), software code, vendor/supplier relationships, pricing, marketing, strategies, financial and operational performance or expectations, channel information (including customer, reseller and client information), employee information, any other non-public information related to the Purpose, and any other information identified at the time of disclosure as confidential, proprietary or other similar designation or information otherwise reasonably understood as confidential. In addition, all notes, analyses, compilations, studies, interpretations or other material prepared by the receiving Party or its Representatives based upon the information specified above shall be the Confidential Information of the disclosing Party. Notwithstanding the foregoing, Confidential Information does not include information which (i) is at the time of disclosure, or thereafter becomes, part of the public domain through no act or fault of the receiving Party, (ii) is known to the receiving Party without an obligation of confidentiality prior to the time of its disclosure by the disclosing Party, (iii) is independently developed by the receiving Party without use of or reference to the Confidential Information, (iv) is rightfully disclosed to the receiving Party by a third party, who, to the receiving Party's knowledge, is not subject to an obligation of confidentiality with respect to the information disclosed.

B. "Representatives" with respect to any person means the directors, officers, employees, agents, professional advisors (including, without limitation, attorneys, accountants, and consultants) of that person, or any of that person's affiliates.

C. The term "person" is to be broadly interpreted to include, without limitation, any corporation, company, partnership, unincorporated association, individual, governmental body or other entity.

2. **Term**. This NDA applies to Confidential Information provided between the Parties from the Effective Date through twelve (12) months thereafter. Either Party may terminate this NDA prior to the end date described herein upon ten (10) days written notice to the other. Such termination shall not alter the rights and obligations of the Parties arising prior to the date of termination. The obligations of each Party shall continue for a period of five (5) years from the date of disclosure of any Confidential Information with the exception that Confidential Information specifically identified as a trade secret shall be held in confidence for so long as the Confidential Information remains a trade secret. Upon termination of this NDA, each Party must cease use of any received Confidential Information, return or destroy all originals, copies, notes and extracts, and, upon request, of disclosing Party, provide written confirmation of compliance. Notwithstanding the foregoing, the Parties' legal departments may retain a copy of the Confidential Information or portions thereof as required for corporate governance purposes.

3. **Use and Protection of Confidential Information**.

A. Each Party agrees that received Confidential Information (i) shall be used solely for the Purpose described above, (ii) will not be used for any other reason or purpose, and (iii) will not be distributed, disclosed or disseminated to anyone except its employees and agents with a need to know and direct involvement in the Purpose that have been informed of the confidential nature of the information and have signed an enforceable non-use and non-disclosure agreement with obligations not less restrictive than those specified herein.

B.  Each Party agrees that it shall take reasonable measures to protect the secrecy of and avoid disclosure and unauthorized use of the Confidential Information of the other Party. Without limiting the foregoing, each Party shall take at least those measures that it takes to protect its own Confidential Information.

C. Neither Party shall (i) reverse engineer, disassemble or decompile any systems, equipment, prototypes, software or other tangible objects which embody the other Party's Confidential Information and which are provided under this NDA, and (ii) make any copies of the Confidential Information of the other Party unless such copies are strictly required for the Purpose or the disclosing Party approves such copies in writing and all copies include all proprietary rights notices in the same manner as such notices were in/on the original.

4. **Legally Required Disclosures**. Notwithstanding any other provision of this NDA, each Party or such Party's Representatives may disclose Confidential Information, without liability for such disclosure, to the extent that such disclosure is required to be made pursuant to applicable law, rule, regulation, government authority, subpoena, court order or other judicial, regulatory or governmental proceeding, or to a court or other tribunal in connection with the enforcement of the Parties' rights under this Agreement. A Party

making such required disclosure shall provide the other Party with reasonable notice, as is practicable and not prohibited by applicable law, and make reasonable efforts to give the other Party an opportunity to respond prior to such disclosure, if practicable.

5. **Confidentiality of Discussions and Relationship.** Except as required by law or as expressly authorized by the other Party, neither Party nor its Representatives will, without the prior written consent of the other party, disclose to any person the fact that Confidential Information has been made available to the receiving Party, that discussions or negotiations are taking place or have taken place between the parties concerning the Purpose; or any of the terms, conditions or other facts with respect to any such potential or actual business relationship or transaction, including the status of any discussions.

6. **Export Restrictions.** Neither Party shall export, directly or indirectly, any Confidential Information, technical data or products acquired under this NDA in violation of any laws or arms regulations of the United States or other applicable jurisdiction.

7. **No Other Obligation.** This NDA shall not be construed as a teaming, joint venture or other such agreement, nor shall it commit the other to use, buy, sell, dispose of any existing or future product, or proceed with any contemplated transaction between the Parties, and each Party reserves the right, in its sole discretion, to terminate any such discussions contemplated by this NDA at any time.

8. **No Other Warranty Or Other License.** Each Party individually represents and warrants that it has full power and authority to execute and deliver this NDA, perform all of its obligations hereunder, and that the individual signing this NDA on such Party's behalf has been duly authorized to do so. While each Party believes that all Confidential Information furnished under this NDA is accurate, neither Party, nor any of its representatives, makes any representation or warranty, express, implied or otherwise, as to the accuracy, completeness of such information and all Confidential Information is provided "AS IS."

9. **Ownership.** All Confidential Information is and remains the property of the disclosing Party and this NDA and the disclosure of Confidential Information hereunder shall not be construed as granting any express or implied license, right, or title to anyone to or under any existing or application for patent, trademark, trade name, copyright or other intellectual property right provided that the receiving Party and its Representatives are granted only a limited personal, non-assignable, non-exclusive, fully revocable license to use the Confidential Information in accordance with the terms and conditions of this NDA.

10. **Governing Law.** This NDA is to be governed in accordance with the laws of the State of Ohio. The Parties agree that, jurisdiction and venue are proper in the selected state's state and federal courts, without regard to choice of law or conflict principles.

11. **Remedies.** The Parties agree that remedies at law may be inadequate to remedy breaches of this NDA and therefore the non-breaching Party may seek equitable remedies to prevent violations of this NDA. In the event of litigation relating to this NDA, if a court of competent jurisdiction determines in a final, non-appealable order that a Party has breached this NDA, then such breaching Party shall reimburse the non-breaching Party for its reasonable outside counsel legal fees and reasonable expenses incurred in connection with such litigation, including any appeals. In no event will either Party be liable for consequential, indirect, incidental, punitive, special, reliance, or similar damages, losses or expenses (including lost profits, competitive advantage, or goodwill) under or in connection with this Agreement, even if such Party has been advised of their possible existence.

12. **Miscellaneous.** This NDA constitutes the entire and final agreement between the Parties hereto with respect to the subject matter hereof and supersedes all prior agreements, representations or understandings, oral or written, between the Parties relating to this subject. Any assignment of this NDA by either Party without the prior written consent of the other Party shall be void, except that ENP may assign this NDA to any of its affiliates. The Parties hereby agree that no attempted amendment, modification, discharge or change to this NDA shall be valid or effective unless both Parties have agreed in writing to such amendment, modification, discharge or change. No failure or delay by either Party in exercising any right hereunder will operate as a waiver thereof, nor shall a single or partial exercise preclude further or other exercise thereof and no waiver of any provision of this Agreement shall be effective unless it is in writing and signed by all Parties hereto. If any provision of this Agreement is adjudicated by a court of competent jurisdiction as invalid, illegal or otherwise unenforceable, but such provision may be made enforceable by a limitation or reduction of its scope, the Parties do hereby agree to abide by such limitation or reduction as may be necessary so that such provision shall be enforceable to the fullest extent permitted by law. A document signed and transmitted by facsimile or other electronic transmission shall be deemed and treated as an original and shall have the same binding effect as an original signature on an original document.

**Understood and Agreed:**

**LIEBERT CORPORATION:**

By: _Dan Cr_

Name: _DAVID SONNOT_

Title: _VP MARKETING_     _8/12/14_

**LIION, LLC:**

By: _____

Name: _CARY GRAY_

Title: _CEO_