## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

LiiON, LLC,

Plaintiff,

v.

VERTIV GROUP
CORPORATION et al.,

Defendants.

Case No. 18-cv-6133

Judge Mary M. Rowland

## MEMORANDUM OPINION AND ORDER

This case arises from a failed business relationship. Plaintiff LiiON, LLC, supplied lithium-ion battery cabinets to Defendants Vertiv Group Corporation, Vertiv Corporation, and Liebert Corporation (collectively, Vertiv), who themselves use those cabinets to make uninterruptible power supply systems to help their clients maintain a constant power supply. After working well together for a brief duration, the parties' relationship eroded and the parties began litigation. LiiON sued Vertiv for breach of a non-disclosure agreement the parties entered at the beginning of their relationship and for trade secret misappropriation under the federal Defend Trade Secrets Act (DTSA) and the Illinois Trade Secrets Act (ITSA). In turn, Vertiv countersued for breach of contract, breach of the implied covenant of good faith and fair dealing, and tortious interference with business expectancy.

After years of contentious litigation, the parties have both now moved for summary judgment. [424]; [431]. Vertiv has additionally moved for sanctions under Federal Rule of Civil Procedure 11 against LiiON. [440]. And LiiON has moved to

alter a prior order awarding Vertiv fees as a sanction for Liion's discovery violations. [436]. For the following reasons, this Court grants Vertiv's motion for summary judgment [424]; grants in part and denies in part LiiON's motion for summary judgment [431]; denies Vertiv's motion for sanctions [440]; and grants in part LiiON's motion to alter judgment [436].

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The substantive law controls which facts are material. *Id.* After a "properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 250 (internal quotations omitted).

The Court "consider[s] all of the evidence in the record in the light most favorable to the non-moving party, and [] draw[s] all reasonable inferences from that evidence in favor of the party opposing summary judgment." *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018) (internal citation and quotations omitted). The Court "must refrain from making credibility determinations or weighing evidence." *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 467 (7th Cir. 2020) (citing *Anderson*, 477 U.S. at 255). In ruling on summary judgment, the Court gives the non-moving

party "the benefit of reasonable inferences from the evidence, but not speculative inferences in [its] favor." *White v. City of Chicago*, 829 F.3d 837, 841 (7th Cir. 2016) (internal citations omitted). "The controlling question is whether a reasonable trier of fact could find in favor of the non-moving party on the evidence submitted in support of and opposition to the motion for summary judgment." *Id.* (citation omitted).

## BACKGROUND[1]

### I.  The Parties

Plaintiff LiiON, LLC is a Nevada limited liability company that maintains its principal place of business in Dundee, Illinois; all of its members are Illinois residents.  [429] ¶ 1.  Defendant Vertiv Group Corporation is a Delaware corporation with its principal place of business in Columbus, Ohio.  *Id.* ¶ 2.  Defendant Vertiv Corporation is an Ohio Corporation with its principal place of business in Columbus, Ohio, and is wholly-owned by Vertiv Group.  *Id.* ¶ 3.  Defendant Liebert Corporation is incorporated and maintains its principal place of business in Columbus, Ohio.  *Id.* ¶ 4.  The parties refer to the Defendants collectively as "Vertiv," so this Court will here, too.

---

[1] This Court takes the following facts from Vertiv's statement of facts [429], LiiON's statement of facts [432], the parties' responses to those statements of facts [457]; [459], Vertiv's statement of additional facts [456], LiiON's responses to Vertiv's statements of additional facts [480], LiiON's statement of additional facts [459], and Vertiv's responses to LiiON's statements of additional facts [476].

## II.     UPS Systems and Lithium-Ion Battery Cabinets

Vertiv is a leading supplier of uninterruptible power supply (UPS) systems. *Id.* ¶ 8.  UPS systems function as a backup battery cabinet power source in case the electric grid goes down, and companies use them to ensure a constant power supply to information technology (IT) and other equipment.  *Id.* ¶ 9.  The back-up power source typically comprises a battery solution such as lead acid or lithium-ion.  *Id.* ¶ 10.

Lithium-ion battery cabinets involve batteries using lithium chemistry to provide power.  *Id.* ¶ 11.  Such lithium chemistries include lithium iron phosphate (LFP), lithium manganese oxide (LMO), lithium nickel manganese cobalt (NMC), and a combination of LMO and NMC.  *Id.* ¶ 12.  Each chemistry possesses different characteristics such as power and energy.  *Id.* ¶ 13.  LiiON supplies lithium-ion battery cabinets for UPS systems.  *Id.* ¶ 17.

## III.    The Parties' Relationship

In July 2014, LiiON shipped lithium-ion battery cabinets to Vertiv to test their compatibility with one of Vertiv's UPS models.  *Id.* ¶ 18.  Vertiv and LiiON also entered into a mutual nondisclosure agreement (NDA) on July 31, 2014.  *Id.* ¶ 19; [429-4] at 88.  The NDA "applie[d] to [contractually defined] Confidential Information provided between the Parties from the Effective Date [July 31, 2014] through twelve (12) months thereafter."  [429] ¶ 20; [429-4] at 88.  It also provides that the "obligations of each Party shall continue for a period of five (5) years from the date of disclosure of any Confidential Information with the exception that Confidential

4

Information specifically identified as a trade secret shall be held in confidence for as long as the Confidential Information remains a trade secret." [429-4] at 88. Finally, as relevant here, it states that in "no event will either Party be liable for consequential, indirect, incidental, punitive, special, reliance, or similar damages, losses or expenses (including lost profits, competitive advantage, or goodwill) under or in connection with this Agreement, even if such Party has been advised of their possible existence." [429] ¶ 21; [429-4] at 89.

Vertiv and LiiON completed testing and installed one of LiiON's lithium-ion battery cabinets with Vertiv's UPS systems at a customer in May 2015. [429] ¶ 23; [453] ¶ 3. Vertiv then re-engaged LiiON in late 2016 to test LiiON's lithium-ion battery cabinet with other Vertiv's UPS systems. [456] ¶ 3. The testing lasted several months. *Id.*

## IV. The Purchase Orders

Between December 2016 and December 2017, Vertiv placed multiple purchase orders for LiiON's battery cabinets. [429] ¶ 26. LiiON supplied some, but not all, of the lithium-ion battery cabinets Vertiv ordered. *Id.* ¶ 27. Vertiv also ordered lithium-ion battery cabinets from LiiON's competitor, Samsung. *Id.* Despite contemplating it, Vertiv never actually entered into a volume commitment with LiiON. [432] ¶ 20.

Vertiv placed one purchase order (PO) on December 8, 2016, for eight of LiiON's lithium-ion battery cabinets at $20,000.00 apiece for a total of $160,000.00. [456] ¶ 7. LiiON responded with a confirmation email on the same date and fulfilled the December 8 order in March 2017. *Id.* ¶¶ 8–9.

5

Vertiv placed another PO for two of LiiON's lithium-ion battery cabinets at $20,000.00 apiece for a total of $40,000.00 on July 26, 2017. *Id.* ¶ 10. LiiON fulfilled this PO in August 2017. *Id.* ¶ 11. On August 18, 2017, Vertiv placed another PO for four of LiiON's cabinets at $20,000.00 apiece for a total of $80,000.00. *Id.* ¶ 12. LiiON shipped two of the four cabinets in September 2017 and the remainder in October 2017. *Id.* ¶ 13.

On November 2, 2017, to fulfill an order its customer QTS made for LiiON lithium-ion battery cabinets, Vertiv sent LiiON an email attaching a PO for fifty lithium-ion battery cabinets at a price of $26,250.00 per cabinet for a total of $1,312,500.00 and requesting a December 15, 2017 ship date. *Id.* ¶¶ 16–17. The PO included the following commercial terms and conditions:

> BUYER EXPRESSLY OBJECTS TO AND EXPRESSLY REJECTS ANY PROVISIONS ADDITIONAL TO OR DIFFERENT THAN THE TERMS OF THAT MAY APPEAR IN SELLER'S ... ACKNOWLEDGMENT, CONFIRMATION, INVOICE OR IN ANY OTHER PRIOR OR LATER COMMUNICATION FROM SELLER TO BUYER UNLESS SUCH PROVISION IS EXPRESSLY AGREED TO BY BUYER IN WRITING SIGNED BY BUYER; . . .

> Time is of the essence. If delivery is not expected to be made on-time, Seller will notify Buyer and will take all reasonable steps at Seller's own cost to expedite delivery; provided, however, Buyer reserves the right, without liability, in addition to its other rights and remedies, to cancel this Purchase Order by notice to Seller and arrange for completion and/or purchase of substitute items elsewhere and to charge Seller with any loss or additional costs incurred; . . .

> Buyer reserves the right to cancel all or any part of the undelivered portion of this Purchase Order. This Purchase Order may be terminated by Buyer or by Seller at any time immediately upon written notice in the event of the other party's material breach of any term or provision of this Purchase Order or upon the occurrence of any of the following events ... (b) such other party makes any materially false statement,

representation or claim; [and] (c) such other party fails to prosecute the work so as to endanger the performance of this Purchase Order…. Buyer will not be responsible for any specific cancellation fees or charges; . . .

This Purchase Order shall be governed by the laws of the State of Missouri.

*Id.* ¶ 18.

On November 2, 2017, LiiON responded to Vertiv's PO for QTS stating: "Thank you for the order!" *Id.* ¶ 19. Sometime later, LiiON asked Vertiv to pay 30% of the QTS PO upfront to assist it in ordering the components it needed. *Id.* ¶ 21. After Vertiv agreed to the upfront payment, LiiON sent it an invoice for 30% of the original PO ($397,750.00), *id.* ¶ 22, on November 9, 2017, LiiON emailed Vertiv: "Please let this email serve as confirmation of ship date . . . to be 12/20/2017," *id.* ¶ 23.

The next day, November 9, 2017, Vertiv sent LiiON an "updated PO" for QTS with Vertiv's corrected cost of $20,000.00 per battery unit; Vertiv informed LiiON the new correct PO total was $1,000,000.00. *Id.* ¶ 24. LiiON responded the same day with a revised invoice for $300,000—30% of the total PO. *Id.* ¶ 25. Vertiv paid the revised $300,000.00 invoice around November 24, 2017. *Id.* ¶ 26.

On November 7, 2017, Vertiv sent an email to LiiON attaching a PO for six of LiiON's lithium-ion battery cabinets at a $20,000 per cabinet price for a total of $180,000.00 and requesting a December 29, 2017 ship date for its customer, IBM. *Id.* ¶ 27. Vertiv also attached its standard commercial terms and conditions. *Id.*; *see also id.* ¶ 18. LiiON responded to Vertiv's PO on the same day, November 7, 2017, stating: "We are confirming receipt of PO #P2202531." *Id.* ¶ 28. On November

28, 2017, LiiON told Vertiv that the IBM PO "is currently scheduled to ship by 12/29." *Id.* ¶ 29.

On November 9, 2017, Vertiv emailed LiiON a PO for two battery cabinets at a $20,000.00 per cabinet price for Vertiv's customer, McDonald's. *Id.* ¶ 30. Vertiv requested LiiON's "best-ship date" and attached its standard commercial terms and conditions. *Id.*; *see also id.* ¶ 18. LiiON responded on the same day, stating: "We will get back to you with a ship date as soon as possible. Thanks [sic] you for the order." *Id.* ¶ 31. A few days later, on November 14, 2017, LiiON's CEO Gary Gray informed Vertiv that the McDonald's PO would be shipping in December 2017 or January 2018. *Id.* ¶ 32.

During November and December 2017, Vertiv and LiiON corresponded about delivery timing for the aforementioned POs. *Id.* ¶ 34. Additionally, on November 29, 2017, LiiON proposed a different pricing structure for the outstanding POs, requesting that Vertiv pay a per unit price of $20,455.00 and that the orders be 100% prepaid. *Id.* ¶ 37. According to LiiON, all of these terms were contingent upon a volume agreement that never materialized. [480] ¶ 37.

On December 9, 2017, LiiON sent separate, but identical, emails concerning the QTS, IBM, and McDonald's POs. [456] ¶ 42. In the emails, LiiON stated that "effectively immediately," the POs were subject to "the new price level" of $28,500.00/System," and the following "purchase conditions": (1) 100% prepayment "at the time of order acceptance"; (2) "Delivery Date to be confirmed upon agreement to these terms"; and (3) "Confirmation required COB 12.12.17." *Id.* Again, LiiON

8

claims it proposed these terms in connection with negotiations for a volume agreement that never consummated. [480] ¶ 42. LiiON reiterated these new terms in a follow-up email to Vertiv on December 11, 2017. [456] ¶ 43.

On December 12, 2017, Vertiv emailed LiiON, maintaining that the original PO terms must continue to govern. *Id.* ¶ 44. The next day, December 13, 2017, Vertiv's then-Chief Operating Officer, Tarek Maguid, held a call with LiiON's Jerry Hoffman to discuss the QTS order. *Id.* ¶ 45. Mr. Hoffman communicated that LiiON would not be able to deliver all 50 cabinets by December 20, 2017; instead, it would deliver the first 30 cabinets in December and the remainder at the beginning of January. *Id.*

The next day, December 14, 2017, Vertiv asked LiiON to "confirm we are still tracking to meet the ack ship date" for the open POs. *Id.* ¶ 46. LiiON replied: "This PO P22023517 CN 2648145 [the QTS PO] or any related POs's, or new PO's are not accepted at these terms as previously notified. LiiON has sufficiently acknowledged this. Until discussions are complete no further updates will be forthcoming." *Id.* About a week later, on December 20, 2017, LiiON's Hoffman emailed Vertiv's Maguid informing him that LiiON would deliver 30 cabinets on January 26, 2018 and the remainder on February 12, 2018. *Id.* ¶ 47.

The next day, however, Maguid and Hoffman held a call during which Mr. Maguid told Hoffman that Vertiv was terminating all open POs, including the QTS, IBM, and McDonald's POs. *Id.* ¶ 50. Vertiv reiterated this message in a letter to LiiON dated the same day (December 21, 2017), stating that it was "cancelling all

open purchase orders" with LiiON due to LiiON's "inability to meet Vertiv's required product delivery dates." [429] ¶ 28.

Also on the same day, December 21, 2017, LiiON held a "direct call" with QTS and told QTS that it could "fulfill the order." [456] ¶ 51. LiiON did not return the $300,000 upfront payment Vertiv made to it in connection with the QTS PO. *Id.* ¶ 55.

## V.   Facts Related to LiiON's Trade Secret Claims

In its second amended complaint, LiiON has asserted two theories of trade secret appropriation against Vertiv, claiming that: (1) Vertiv has been using products containing LiiON's trade secrets without LiiON's permission; and (2) Vertiv has disclosed LiiON's trade secrets to LiiON's competitor, Samsung. [135] ¶¶ 92–93.

LiiON describes its claimed trade secrets, in pertinent part, as follows:

> LiiON's trade secrets encompasses its proprietary algorithms, source code, and procedures and methodology used to optimize the system operating parameters, determine safety trigger points, and established runtime timers that allow for high-rate discharges while maintaining a safe operating environment.

[429-5] at 47; [429] ¶ 34.

In April 2019, Vertiv announced the release of its own in-house lithium-ion battery cabinet which it named the "HPL." [429] ¶ 61. The HPL uses lithium-ion batteries with NMC chemistry. *Id.* LiiON's fact witnesses, Gary Gray and Tom Lynn, were unaware of any similarities between Plaintiff's and Vertiv's lithium-ion battery cabinets that implicated LiiON's claimed trade secrets. *Id.* Likewise, LiiON's expert, Brian Dillard, had no knowledge of any similarities between the companies' lithium-

ion battery cabinets implicating LiiON's claimed trade secrets. *Id.* ¶ 65. Gray additionally testified that he was unaware of being told or seeing any documents indicating that Vertiv shared LiiON's specifications, algorithms, or source code with Samsung. *Id.* ¶ 67. Lynn similarly testified that he was unaware of documents or information indicating that Vertiv shared LiiON's specifications or current limit timers with Samsung. *Id.* ¶ 68.

LiiON and Samsung use different lithium-ion chemistries for their battery cabinet: LiiON's battery cabinet uses lithium-ion batteries with LFP chemistry, while Samsung's battery cabinet uses lithium-ion batteries with a NMC/LMO blend chemistry. *Id.* ¶ 74. Additionally, LiiON and Samsung use different current and time thresholds for their current limit timers. *Id.* ¶ 75. The two companies also use different "temperature thresholds/limits," meaning that LiiON uses warnings or disconnects from the UPS system triggered at four different temperature thresholds while Samsung uses only one temperature threshold and does not employ a warning before disconnecting. *Id.* ¶ 76.

## VI. The Parties' Claims and Counterclaims

In its (operative) second amended complaint, LiiON brings a nine-count complaint against Vertiv for: violations of the ITSA (Count I, III, and V); violations of the DTSA (Count II, IV, and VI); and breach of contract (Counts VII–IX). [135].

Vertiv, for its part, counterclaimed against LiiON for breach of the POs (Count I); breach of the implied covenant of good faith and fair dealing (Count II); promissory estoppel (Count III); tortious interference with business expectancy (Count IV);

11

declaratory judgment "of no misappropriation of trade secrets" (Count V); and declaratory judgment "of no breach of contract" (Count VI). [38]. By stipulation of the parties, this Court dismissed Vertiv's counterclaims at Counts V and VI. [414].

## ANALYSIS

Vertiv moves for summary judgment on LiiON's second amended complaint, [424], and LiiON moves for summary judgment on Vertiv's counterclaims, [431]. In addition, Vertiv has moved for sanctions pursuant to Federal Rule of Civil Procedure 11 against LiiON, [440], and LiiON has moved to alter this Court's January 22, 2021 order awarding fees to Vertiv as a result of LiiON's discovery violations, [436]. This Court will address each motion in order below.

## I. Vertiv's Motion for Summary Judgment

### A. Counts I–VI: LiiON's Trade Secret Claims

This Court first considers LiiON's parallel claims under the DTSA and ITSA.

The DTSA and ITSA supply private causes of action in favor of the owner of a misappropriated trade secret. 18 U.S.C. § 1836(b)(1); 754 Ill. Comp. Stat. 1065/4. To prove misappropriation under either statute, LiiON must demonstrate the information is: (1) a trade secret; (2) misappropriated—that is, stolen from it rather than developed independent or obtained from a third source; and (3) used in Defendant's business. *Inventus Power, Inc. v. Shenzhen Ace Battery Co.*, No. 20-CV-3375, 2020 WL 3960451, at *8 (N.D. Ill. July 13, 2020) (citing *Vendavo, Inc. v. Long*, 397 F. Supp. 3d 1115, 1129 (N.D. Ill. 2019)).

A trade secret under the DTSA includes:

all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if—

> (A) the owner thereof has taken reasonable measures to keep such information secret; and

> (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information[.]

18 U.S.C. § 1839(3). The ITSA's definition of "trade secret" is materially identical. *See Life Spine, Inc. v. Aegis Spine, Inc.*, --- F.4th ----, No. 21-1649, 2021 WL 3482921, at *5 (7th Cir. Aug. 9, 2021) (citing 754 Ill. Comp. Stat. 1065/2(d)).

The parties devote large portions of their briefs contesting whether LiiON has sufficiently set forth evidence that it possesses a legally cognizable "trade secret." LiiONs' claimed trade secrets are the alleged proprietary algorithms, source code, and procedures and methodology used to optimize system operating parameters, determine safety trigger points, and establish runtime timers that allow for high-rate discharges while maintaining a safe operating environment. [429-5] at 47; [429] ¶ 34. Vertiv argues that LiiON has neither identified its alleged trade secrets with requisite specificity nor kept its alleged trade secrets sufficiently private to qualify as actual "secrets." [428] at 10–17. LiiON counters that its witnesses can testify as to specificity of the trade secrets and that it has taken steps to keep its trade secrets sufficiently private. *See* [458] at 4–16. The Seventh Circuit has emphasized that

generally, the "existence of a trade secret is a question of fact," *Life Spine*, 2021 WL 3482921, at *6, and that "trade secret" remains one of the "most elusive and difficult concepts in the law to define," *Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 723 (7th Cir. 2003) (quoting *Lear Siegler, Inc. v. Ark–Ell Springs, Inc.,* 569 F.2d 286, 288 (5th Cir. 1978)).

In any event, this Court need not resolve the issue of whether LiiON sufficiently establishes the existence of a trade secret because even if it did, its claims nonetheless fail on the second element of its trade secret claims—misappropriation. Under the DTSA and ITSA, LiiON can prove misappropriation by showing "unauthorized acquisition, disclosure, or use of a trade secret." *J.S.T. Corp. v. Foxconn Interconnect Tech. Ltd.*, 965 F.3d 571, 576 (7th Cir. 2020); *see also Life Spine, Inc. v. Aegis Spine, Inc.*, No. 19 CV 7092, 2021 WL 963811, at *17 (N.D. Ill. Mar. 15, 2021), *aff'd*, No. 21-1649, 2021 WL 3482921 (7th Cir. Aug. 9, 2021); *Act II Jewelry, LLC v. Wooten*, 318 F. Supp. 3d 1073, 1091 (N.D. Ill. 2018). The Court has previously dismissed LiiON's theory based upon improper acquisition. [106]. Thus, LiiON proceeds only on the theories of unauthorized disclosure and improper use.

On the theory of improper use, courts interpret "use" broadly as: marketing goods that embody the trade secret, employing the trade secret in manufacturing or production, relying upon the trade secret for research or development, or soliciting customers through use of information that constitutes a trade secret. *See Motorola Sols., Inc. v. Hytera Commc'ns Corp.*, 436 F. Supp. 3d 1150, 1165 (N.D. Ill. 2020). The record contains no evidence that Vertiv engaged in any of these types of "use." LiiON

14

claims that Vertiv's release of its own lithium-ion battery cabinet (the HPL) after working with LiiON on LiiON's cabinets demonstrates "use" of LiiON's trade secrets. [429] ¶ 61. Critically, however, none of LiiON's fact or expert witnesses could identify any qualities in Vertiv's lithium-ion battery cabinets that implicated LiiON's claimed trade secrets. *Id.* ¶¶ 61, 65. This lack of evidence dooms LiiON's misappropriation claims based upon a "use" theory. *See, e.g.*, *Saniteq, LLC v. GE Infrastructure Sensing, Inc.*, No. CV17771SJFARL, 2018 WL 4522107, at *9 (E.D.N.Y. July 12, 2018) (granting summary judgment based upon a "use" theory in part because the plaintiff's fact witness admitted he had no knowledge that the defendant used the plaintiff's trade secrets), *report and recommendation adopted*, No. 17-CV-771 (SJF)(ARL), 2018 WL 4357475 (E.D.N.Y. Sept. 13, 2018).

Nevertheless, LiiON maintains that the existence of general similarities between its battery cabinet and Vertiv's HPL, namely, "high-power energy, 10-year runtime warranty, ability to operate at higher temperatures, and improved total cost of ownership," evidences Vertiv's "use" of LiiON's trade secrets. [458] at 19. To be sure, evidence that a plaintiff's and defendant's products share similar features can, under some circumstances, raise an inference that the defendant "used" a plaintiff's trade secret. *PolyOne Corp. v. Lu*, No. 14 CV 10369, 2018 WL 4679577, at *12 (N.D. Ill. Sept. 28, 2018); *see also Leggett & Platt, Inc. v. Hickory Springs Mfg. Co.*, 285 F.3d 1353, 1361 (Fed. Cir. 2002) (noting that "access and similarity" can support an Illinois trade secret misappropriation claim); *accord Town & Country Linen Corp. v. Ingenious Designs LLC*, No. 18-CV-5075 (LJL), 2021 WL 3727801, at *38 (S.D.N.Y.

Aug. 23, 2021) ("In the context of trade secret misappropriation cases—where it is well recognized that misuse can rarely be proved by convincing direct evidence . . . copying can be established by showing that a defendant had access to the alleged trade secrets and that there is a substantial similarity between the original product which embodied those trade secrets and the alleged copy created by the defendant.") (quotation omitted). Yet LiiON cites *no* evidence supporting its bare contention that its product and Vertiv's, in fact, contain these claimed similar features, and thus fails to meet its evidentiary burden on summary judgment to establish the existence of an element essential to its case. *See* [458] at 19; *see also Gabb v. Wexford Health Sources, Inc.*, 945 F.3d 1027, 1032 (7th Cir. 2019) (noting that summary judgment must be entered against the non-moving party based upon its failure to make a showing sufficient to establish the existence of an element essential to its case).

Moreover, it is "not enough to point to broad areas of technology and assert that something there must have been secret and misappropriated. The plaintiff must show concrete secrets." *Composite Marine Propellers, Inc. v. Van Der Woude*, 962 F.2d 1263, 1266 (7th Cir. 1992). LiiON, however, points only to broad similarities between the two products. It makes no effort to show that the allegedly similar features between the products—high-power energy, runtime warranty, operation at higher temperatures, and improved cost of ownership—are actually attributable to Vertiv's use of LiiON's alleged trade secrets. Absent further evidentiary proffer, this Court finds LiiON's claim that Vertiv misappropriated its trade secret through "use"

16

insufficiently concrete and speculative to overcome summary judgment. *See id.*; *see also, e.g.*, *Spear Mktg., Inc. v. BancorpSouth Bank*, 791 F.3d 586, 601–02 (5th Cir. 2015) (affirming summary judgment based upon a "use" misappropriation theory because the plaintiff failed to provide specific evidence of similarity between products, never had an expert perform a side-by-side comparison of the programs, and rested its entire argument for similarity on coincidence of timing and the fact that the two products performed the same general function); *Stratienko v. Cordis Corp.*, 429 F.3d 592, 600 (6th Cir. 2005) (finding summary judgment warranted where the plaintiff failed to identify "which, if any, *innovative* features" of his and defendant's designs were similar) (emphasis in original).

LiiON's theory of misappropriation-by-disclosure is similarly deficient. LiiON contends that its alleged trade secrets began appearing in its competitor Samsung's products over time and that the "only link" for Samsung to receive such trade secrets was through Vertiv. [458] at 22–24. Yet the record contains no testimony from employees of Vertiv or Samsung indicating that Vertiv gave LiiON's alleged trade secrets to Samsung, and LiiON's own witnesses testified that they have no knowledge of any information or documents indicating that Veritiv shared any of LiiON's proprietary algorithms, source code, procedures, or methodologies with Samsung. [429] ¶¶ 67–69.

LiiON offers a December 2015 email chain between Vertiv employees that it argues implies disclosure. [458] at 23–24. In that email, Vertiv's Justin Mayle writes to other Vertiv employees: "I pirated the LI-iON [sic] battery test spec document and

used it to start some possible test cases for the Samsung Battery cabinets." [462-29] at 1. LiiON makes much of the phrase "pirated the LI-iON [sic] battery test spec document," but Mayle explained in his deposition that the referenced "test spec document" contained only general battery test specs (such as maximum and minimum voltage), which are not proprietary but rather something that "any customer would be able to have access to." [462-30] at 34–35. Moreover, as Mayle testified, he merely used the "test spec document" for *internal* tests Vertiv was performing with either the LiiON's or Samsung's battery cabinet; he never provided any test reports for LiiON's products *to Samsung*. [462-30] at 82–83. LiiON does not offer any countervailing evidence demonstrating that the test reports contained trade secrets and were, in fact, transmitted to Samsung. This email therefore does not evidence an unauthorized disclosure of any trade secret to Samsung.

LiiON also suggests that this Court can infer disclosure from the fact that Samsung began manufacturing battery cabinets that "closely mirrored components and functions like that of" LiiON's cabinets after it began working with Vertiv in 2015. [458] at 22. The record, however, undermines LiiON's claims of similarity. In fact, LiiON concedes that its battery cabinets are different to Samsung's in material respects: the two competitors use different lithium-ion chemistries, utilize different current and time thresholds for their current limit timers, and operate at different temperature thresholds and limits. [429] ¶¶ 74–76. Further, as with its misappropriation-by-use theory, LiiON bases its misappropriation-by-disclosure theory only upon its belief that there exist broad similarities between its product and

18

Samsung's; LiiON fails otherwise to specify which aspects of Samsung's technology actually incorporate LiiON's claimed trade secrets. *See Stratienko*, 429 F.3d at 602 ("The analysis of similarity evaluates only relevant, innovative features, not all possible congruence."). No reasonable jury could find misappropriation on this record.

In sum, LiiON lacks sufficient evidence to raise a triable issue of fact on its trade secret claims under the DTSA and ITSA. Accordingly, this Court grants summary judgment to Vertiv on LiiON's trade secret claims.

### B.   Counts VII–IX: LiiON's Breach of Contract Claims

Vertiv next moves for summary judgment on LiiON's breach of contract claims. LiiON claims that Vertiv breached their 2014 NDA by utilizing or divulging LiiON's trade secrets to some unspecified third parties. [458] at 25–26. To prevail on its breach of contract claims under either Ohio or Illinois law,[2] LiiON must show (1) the terms of the contract; (2) performance by the LiiON; (3) a breach by the defendant; (4) damages; and (5) consideration. *McGee v. Armstrong*, 941 F.3d 859, 868 (6th Cir. 2019) (Ohio law); *Cogswell v. CitiFinancial Mortg. Co.*, 624 F.3d 395, 398 (7th Cir. 2010) (Illinois law).

Vertiv argues that LiiON lacks evidence of breach and damages, and this Court agrees. The sole piece of evidence upon which LiiON relies to prove a breach consists of a June 2017 email chain among Vertiv employees discussing a LiiON bill of materials (BOM) that one of its employees sent to a third-party distributor (not

---

[2] Vertiv argues that Ohio law governs the NDA, [428] at 21 n.4, while LiiON cites Illinois law, [458] at 24. The laws of the two states do not differ in regards to breach of contract claims.

Samsung). [458] at 26. Vertiv, for its part, does not dispute the facts that: (1) the BOM constitutes confidential information under the NDA; and (2) one of its employees disclosed this confidential information to a third party. [475] at 23. Notwithstanding, as Defendant also points out, the NDA "applie[d] to [contractually defined] Confidential Information provided between the Parties from the Effective Date [July 31, 2014] through twelve (12) months thereafter," [429] ¶ 20; [429-4] at 88, and LiiON does not offer any evidence indicating that it provided the confidential BOM to Vertiv during that one-year time frame between July 31, 2014 and July 31, 2015. Absent such evidence, LiiON fails to establish breach, an essential element of the claim on which it bears the burden of proof. This failure alone entitles Vertiv to summary judgment on LiiON's breach of contract claim. *See, e.g.*, *Progressive Nat'l Baptist Convention, Inc. v. Urb. Ministries, Inc.*, No. 14 C 5258, 2017 WL 3841638, at *2 (N.D. Ill. Aug. 31, 2017) (granting summary judgment on a breach of contract claim where the plaintiff failed to show its own performance under the contract).

LiiON's breach of contract claim also fails on the essential element of damages. Its only evidence of contractual damages comes from the expert report of Christopher Leisner, [458] at 26, which discusses *only* lost profit damages, *see* [461-25] at 3, 13. Problematically, however, the NDA provides that in "no event will either Party be liable for consequential, indirect, incidental, punitive, special, reliance, or similar damages, losses or expenses (*including lost profits*, competitive advantage, or goodwill) under or in connection with this Agreement, even if such Party has been advised of their possible existence." [429-4] at 89 (emphasis added). Because the

20

NDA expressly carves out lost profit damages, and LiiON otherwise has no proof of damages allowable under the NDA, LiiON's breach of contract claim also fails as to that element. This Court therefore grants summary judgment to Vertiv on LiiON's breach of contract claim.

## II.     Vertiv's Counterclaims

### A.     Count I: Vertiv's Breach of Contract Counterclaim

This Court next considers Vertiv's counterclaim for breach of contract based upon the QTS, McDonald's, and IBM POs. *See* [38] at Count I; [455] at 8–11. Under Missouri law, which the parties agree applies to this claim, Vertiv must prove: (1) the existence and terms of a contract; (2) that Vertiv performed or tendered performance pursuant to the contract; (3) breach of the contract by LiiON; and (4) damages. *Pietoso, Inc. v. Republic Servs., Inc.*, 4 F.4th 620, 622 (8th Cir. 2021); *Moore v. Armed Forces Bank, N.A.*, 534 S.W.3d 323, 327 (Mo. Ct. App. 2017). LiiON advances several arguments in support of its motion for summary judgment on this claim.

First, on the first element of a breach of contract claim—the existence of a contract—LiiON argues that the POs never amounted to valid contracts because "they were never accepted." [433] at 12. Not so. Missouri law determines the existence of a contract according to the "mirror-image rule," which requires a definite offer and a mirror-image acceptance. *Am. Recreation Prod., LLC v. Tennier Indus., Inc.*, 11 F. Supp. 3d 959, 966 (E.D. Mo. 2014). The element of acceptance is met when the "offeree signifies assent to the terms of the offer in a positive and unambiguous manner." *Shockley v. PrimeLending*, 929 F.3d 1012, 1017 (8th Cir. 2019) (internal

quotation marks omitted). In the context of purchase orders, an "order confirmation" to a purchase order qualifies as acceptance of an offer. *Morgantown Mach. & Hydraulics of Ohio, Inc. v. Am. Piping Prod., Inc.*, 887 F.3d 413, 416 (8th Cir. 2018). Here, because it is undisputed that LiiON confirmed each of the POs, this Court finds that LiiON accepted each of them, and the parties formed valid contracts. *See* [456] ¶¶ 19, 23, 28, 31–32. LiiON contends that it never accepted the POs "because of Vertiv's failure to follow through on their promises to provide a supply or volume agreement." [433] at 12. But the POs do not themselves reference any supply or volume agreement, and LiiON introduces no evidence suggesting that the parties had any agreement that premised LiiON's acceptance of the PO on Vertiv's provision of a volume agreement. The fact of a contemplated volume agreement between the parties has no bearing on whether LiiON accepted the POs.

Next, while LiiON admits that it did not deliver the battery cabinets subject to the POs, it argues that it nonetheless could not have materially breached any of the POs because it did not have the opportunity to complete performance before Vertiv cancelled them. [479] at 4. Vertiv counters that LiiON anticipatorily repudiated the POs, thus entitling Vertiv to cancel the POs (thus nullifying LiiON's obligation to deliver) and sue LiiON for breach of contract. [455] at 15–16. In Missouri, an anticipatory repudiation by an "obligor to a contract gives the obligee the right to treat the agreement as broken." *Nat'l Liberty Corp. v. Wal-Mart Stores, Inc.*, 120 F.3d 913, 916 (8th Cir. 1997). A "party repudiates a contract by manifesting a positive intention not to perform. This manifestation may be by words or conduct." *Mar-Kay*

*Plastics, Inc. v. Alco Standard Corp.*, 825 S.W.2d 381, 384 (Mo. Ct. App. 1992); *see also SLEC, LLC v. Ashley Energy, LLC*, No. 4:18-CV-01377-JAR, 2019 WL 7195343, at *10 (E.D. Mo. Dec. 26, 2019). Missouri law entitles a party aggrieved by an anticipatory repudiation to "statutory remedies for breach [of contract], including breach of the whole contract," *Scullin Steel Co. v. Paccar, Inc.*, 708 S.W.2d 756, 761 (Mo. Ct. App. 1986), and cancellation of the contract, *Ewanchuk v. Mitchell*, 154 S.W.3d 476, 482 (Mo. Ct. App. 2005); *see also* Mo. Ann. Stat. § 400.2-711.

Based upon the record, this Court finds that a reasonable jury could find that LiiON materially breached the POs by anticipatory repudiation. Indeed, the record shows that, after LiiON confirmed each PO at the pricing terms contained within each PO, it then attempted to renegotiate better pricing terms with Vertiv. When those negotiations went nowhere, LiiON wrote to Vertiv on December 20, 2017 that the POs "are not accepted at these [previously set] terms" and that it would not complete delivery without better pricing terms than originally agreed upon. [456] ¶¶ 46–47. A reasonable fact-finder could conclude that those words evidenced a positive intention not to perform the POs, thus resulting in a breach of contract by anticipatory repudiation that allowed Vertiv the right to cancel the POs and sue for damages.

LiiON also argues that it is entitled to summary judgment because Vertiv's cancellation of the POs was part of a "larger scheme by Vertiv to create its own lithium-ion battery solution and eliminate [LiiON] from the equation as a viable lithium cabinet provider." [433] at 5. This argument lacks merit. Bad faith—or any

23

evidence of intent, for that matter—is irrelevant to the issue of whether either party breached the POs. *See HM Compound Servs. LLC v. Express Scripts Inc.*, 349 F. Supp. 3d 794, 804 (E.D. Mo. 2018) (noting that a "party's state of mind, intent of knowledge is not relevant on a breach of contract claim").

LiiON also invokes an impracticability defense, contending that it experienced difficulties in seasonably purchasing a battery that it needed for the production of its cabinets; this hold-up, according to LiiON, made it impracticable for it to render a timely delivery to Vertiv and therefore excuses it from breach of contract. [433] at 4–5. The "central issue in the application of the doctrine of impracticability is foreseeability. If the risk of the occurrence of the contingency was foreseeable, the risk is tacitly assigned to the seller." *Structural Polymer Grp., Ltd. v. Zoltek Corp.*, No. 4:05-CV-321 (CEJ), 2006 WL 8445566, at *5 (E.D. Mo. Sept. 14, 2006). By the same token, the impracticability defense "is unavailable where a contingency is foreseeable because the disadvantaged party could have contractually protected itself." *Id.* As the party invoking the impracticability defense, LiiON bears the burden of proving its applicability. *Id.* Yet LiiON has fallen short because it has failed to put forth any evidence indicating that its failure to procure battery supplies was an unforeseeable event. Accordingly, this Court cannot find as a matter of law that LiiON's performance was commercially impracticable.

LiiON also raises various unsuccessful miscellaneous arguments about contractual damages. LiiON claims that Vertiv cannot prove "damages for loss or [sic] relationship with QTS" because Missouri law only allows consequential and

24

incidental damages flowing from nondelivery. [433] at 11–12. But, as Vertiv points out, its request for "loss of relationship" damages is directed only at its tortious interference claim, not its breach of contract claim. [455] at 19. LiiON also argues that Vertiv cannot establish lost profit damages in connection with the QTS PO because LiiON did not materially breach the contract, [433] at 10, and that it did not accept the POs for which Vertiv claims damages, *id.* at 12. These arguments, however, are directed at other elements of a breach of contract claim—breach and formation—and are thus irrelevant to the element of damages.

In sum, this Court denies LiiON's motion for summary judgment as to Vertiv's breach of contract counterclaim.

### B.  Count II: Vertiv's Counterclaim for Breach of the Implied Covenant of Good Faith and Fair Dealing

LiiON next moves for summary judgment on Vertiv's claim for breach of the implied covenant of good faith and fair dealing on the basis that Vertiv lacks evidence that LiiON intentionally engaged in bad faith with respect to the POs. [433] at 12–16. This Court finds that fact issues preclude summary judgment on this claim.

A duty of good faith and fair dealing inheres in every contract governed by Missouri law. *Bishop & Assocs., LLC v. Ameren Corp.*, 520 S.W.3d 463, 471 (Mo. 2017). To prevail on this claim, Vertiv bears the burden to establish that LiiON "exercised a judgment conferred by the express terms of the agreement in such a manner as to evade the spirit of the transaction or so as to deny [Vertiv] the expected benefit of the contract." *Smith v. City of Byrnes Mill*, No. 4:14-CV-1220-SPM, 2015 WL 4715948, at *4 (E.D. Mo. Aug. 7, 2015) (quoting *Lucero v. Curators of the Univ.*

*of Mo.,* 400 S.W.3d 1, 9–10 (Mo. Ct. App. 2013)).  The record here contains sufficient evidence from which a reasonable jury could find that LiiON evaded the spirit of the transactions to deny Vertiv its expected benefits.  Specifically, the evidence indicates that, after LiiON accepted the terms of the POs, it did not meet expected delivery dates; then, after Vertiv pressed for delivery dates, LiiON tried to back out of the POs by attempting to renegotiate more favorable pricing terms and withheld further delivery updates unless Vertiv agreed to pay more.  These facts raise an inference that LiiON was "being opportunistic and exploiting the situation to improve [its] gains"—one way to show breach of the implied covenant of good faith and fair dealing. *NTD I, LLC v. Alliant Asset Mgmt. Co., LLC*, 362 F. Supp. 3d 664, 684 (E.D. Mo. 2019).

According to LiiON, its conduct should be interpreted not as bad faith but rather as a "plea for additional funds to ensure delivery under the" POs.  [433] at 15. True, a reasonable jury could draw that conclusion from the facts as well.  Yet, given the opposing inferences arising from the facts, the question of whether LiiON acted in good faith remains a fact issue inappropriate for summary judgment. *See Fujifilm N. Am. Corp. v. D/C Exp. & Domestic Packing, Inc.*, 339 F. Supp. 3d 790, 797 (N.D. Ill. 2018) ("In deciding a summary judgment motion, the Court cannot weigh conflicting evidence, assess the credibility of the witnesses, or determine the ultimate truth of the matter, as these are functions of the jury.") (first citing *Anderson*, 477 U.S. at 255 (1986); then citing *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704–05 (7th Cir. 2011)).  This Court therefore denies summary judgment to

LiiON on Vertiv's claim for the breach of the implied covenant of good faith and fair dealing.

### C.    Count IV: Vertiv's Tortious Interference Counterclaim

LiiON next moves for summary judgment on LiiON's counterclaim for tortious interference with business expectancy.  To prevail on this claim, Vertiv must prove the following five elements: (1) a valid business expectancy; (2) LiiON's knowledge of the relationship; (3) a breach induced or caused by LiiON's intentional interference; (4) absence of justification; and (5) damages.  *CGB Diversified Servs., Inc. v. Baumgart*, 504 F. Supp. 3d 1006, 1022 (E.D. Mo. 2020).  Vertiv bases its tortious interference claim around evidence that, immediately after Vertiv terminated the POs on December 21, LiiON held a direct call with Vertiv's customer QTS the very same day and offered to fulfill QTS' order directly.  [456] ¶¶ 50–51.  Vertiv argues that this evidence, combined with the facts surrounding LiiON's conduct in delaying delivery and attempting to renegotiate higher prices for the POs, suggests that LiiON actively interfered with Vertiv's business relationship with QTS.   This intentional interference, Vertiv contends, allowed LiiON to cut Vertiv out as the middleman and supply QTS directly.  [455] at 23–24.  For its part, LiiON argues that Vertiv lacks sufficient evidence to establish the third and fourth elements of a tortious interference claim—intent and the absence of justification.  [433] at 17.

Taking the latter first, the phrase "absence of justification" means "the absence of a legal right to justify actions taken."  *W. Blue Print Co., LLC v. Roberts,* 367 S.W.3d 7, 20 (Mo. 2012).   In practical terms, this means that if LiiON "has a

legitimate interest, economic or otherwise, in the expectancy [Vertiv] seeks to protect, then [Vertiv] must show that [LiiON] employed improper means in seeking to further only [its] own interests." *Stehno v. Sprint Spectrum, L.P.*, 186 S.W.3d 247, 252 (Mo. 2006). Such "improper means" include threats, violence, trespass, defamation, misrepresentation of fact, restraint of trade, or another wrongful act recognized under statute or by common law. *Captiva Lake Invs., LLC v. Fid. Nat'l Title Ins. Co.*, 883 F.3d 1038, 1054–55 (8th Cir. 2018); *see also Semi-Materials Co. v. MEMC Elec. Materials, Inc.*, No. 4:08CV434 JCH, 2009 WL 4730346, at *7 (E.D. Mo. Dec. 4, 2009) ("Improper means are those which are independently wrongful notwithstanding injury caused by the interference.") (internal quotation omitted).

The parties dispute whether LiiON used such improper means. Vertiv asserts that LiiON used "improper means" via repeated misrepresentations about its delivery dates and threats to withhold updates unless Vertiv agreed to better pricing terms. [455] at 24. This Court agrees that the record could support the inference that LiiON made misrepresentations and threats. As discussed in connection with Vertiv's contract-based claims, the record shows that after LiiON initially confirmed delivery dates concerning the QTS PO, it delayed delivery, attempted to renegotiate better terms, and threatened to withhold delivery updates unless Vertiv agreed to better pricing terms. Then, after Vertiv cancelled the outstanding POs on December 21, 2017, LiiON immediately went to QTS, offering to fulfill the orders directly. These undisputed facts, viewed in the light most favorable to Vertiv, could lead a reasonable factfinder to conclude that LiiON was using improper means by misrepresentations

and threats to damage Vertiv's relationship with QTS. Genuine issues of material fact therefore exist as to the "absence of justification" element of Vertiv's tortious interference claim.

For the same reasons, genuine issues of material fact exist as to whether Vertiv can demonstrate the third element of its tortious interference claim—intentional interference. *See Baugher v. Gates Rubber Co.*, 863 S.W.2d 905, 910 (Mo. Ct. App. 1993) (noting that tortious interference requires proof of an "intentional wrong"). That is, the record contains sufficient evidence from which a reasonable jury could conclude that LiiON intentionally misrepresented delivery dates to damage Vertiv's relationship with QTS, thus paving the way for LiiON to deal directly with QTS. This suffices to raise a triable issue as to whether LiiON engaged in an intentional wrong to interfere with the business relationship between Vertiv and QTS.

LiiON also argues that the economic loss doctrine forecloses Vertiv's tortious interference claim. [433] at 20–21. Under Missouri law, the economic loss doctrine "bars recovery of purely pecuniary losses in tort where the injury results from a breach of a contractual duty." *Vogt v. State Farm Life Ins. Co.*, 963 F.3d 753, 774 (8th Cir. 2020) (quoting *Dubinsky v. Mermart, LLC*, 595 F.3d 812, 819 (8th Cir. 2010)), *cert. denied*, 209 L. Ed. 2d 577 (Apr. 19, 2021). Even assuming, however, that Vertiv's tort damages are purely contractual in nature, "Missouri law . . . expressly limits [the economic loss] doctrine to warranty and negligence or strict liability claims." *Vogt*, 963 F.3d at 774; *see also Dunne v. Res. Converting, LLC*, 991 F.3d 931, 943 (8th Cir. 2021); *see also, e.g., Mea Fin. Enters., LLC v. Fiserv Sols., Inc.*, No. 13-

05041-CV-SW-BP, 2013 WL 12155467, at *3 (W.D. Mo. Oct. 16, 2013). Accordingly, the economic loss doctrine does not bar Vertiv's tortious interference claim.

For these reasons, this Court denies LiiON's motion for summary judgment as to Vertiv's tortious interference claim.

### D. Count III: Vertiv's Promissory Estoppel Counterclaim

LiiON next moves for summary judgment on Count III of Vertiv's counterclaim, in which Vertiv claims to have been damaged under a promissory estoppel theory as a result of LiiON's breach of its promise and failure to deliver the battery cabinets that Vertiv ordered. *See* [38] ¶ 58.

Initially, the parties dispute which state's law applies to this counterclaim. LiiON cites to Missouri law, while Vertiv relies upon Illinois law. *Compare* [433] at 21 *with* [455] at 26 n.8. The dispute makes no difference, however, because under either state's law, the existence of a contract defeats a promissory estoppel claim. *Williams v. Medalist Golf, Inc.*, 910 F.3d 1041, 1047 (8th Cir. 2018) ("Ordinarily, 'promissory estoppel serves as an equitable remedy where an express contract *does not* exist.'") (quoting *Chesus v. Watts*, 967 S.W.2d 97, 106 (Mo. Ct. App. 1998)); *Boswell v. City of Chicago*, 69 N.E.3d 379, 385 (Ill. App. Ct. 2016) ("While breach of contract and promissory estoppel claims can be pled in the alternative, once a court finds that there was an enforceable contract (with consideration), then a party cannot recover under promissory estoppel."). Because, as discussed above, the POs constitute valid, express contracts governing the parties' rights and obligations regarding the battery cabinets, Vertiv cannot succeed on its promissory estoppel counterclaim under either

Illinois or Missouri law. This Court thus grants summary judgment to LiiON on Vertiv's promissory estoppel counterclaim.

## III. Vertiv's Motion for Rule 11 Sanctions

Vertiv has also moved for Rule 11 sanctions against LiiON. [440]. Vertiv asserts that LiiON sued Vertiv for improper purposes and without a good faith basis for its claims. [442] at 10–11.

Federal Rule of Civil Procedure 11(b) requires attorneys to certify to the best of their "'knowledge, information, and belief, formed after an inquiry reasonable under the circumstances' that their filings have adequate foundation in fact and law and lack an 'improper purpose.'" *Royce v. Michael R. Needle P.C.*, 950 F.3d 939, 957 (7th Cir. 2020) (quoting Fed. R. Civ. P. 11(b)). This Court possesses considerable discretion in deciding whether to impose Rule 11 sanctions. *Divane v. Krull Elec. Co., Inc.,* 200 F.3d 1020, 1025 (7th Cir. 1999). In determining whether sanctions are appropriate, the Court must make "an objective inquiry into whether the party or his counsel should have known that his position is groundless." *Cuna Mut. Ins. Soc. v. Office & Prof'l Emps. Int'l Union, Local 39,* 443 F.3d 556, 560 (7th Cir. 2006) (citation and internal quotations omitted).

Vertiv argues that LiiON's conduct in filing and maintaining this suit merits Rule 11 sanctions due to the lack of evidence it possesses on its trade secret claims. To be sure, as discussed above, LiiON lacks evidence to substantiate its trade secret claims. That does not, however, mean that its maintenance of trade secret claims warrants Rule 11 sanctions. The "fact that the underlying claim turned out to be

groundless does not necessarily mean that Rule 11 sanctions are appropriate (much less required)." *Corley v. Rosewood Care Ctr., Inc. of Peoria*, 388 F.3d 990, 1014 (7th Cir. 2004). Rule 11 requires only "that there is (or likely will be) 'evidentiary support' for the allegation, not that the party will prevail with respect to its contention." *Iosello v. Orange Lake Country Club Inc.*, No. 14 C 3051, 2015 WL 2330180, at *3 (N.D. Ill. May 14, 2015) (citing Fed. R. Civ. P. 11(b)(3) Advisory Committee Notes (1993 Amendments)); *see also Priddle v. Malanis*, No. 12-CV-5831, 2017 WL 2080328, at *3 (N.D. Ill. May 15, 2017). In their response to Vertiv's Rule 11 motion, LiiON's attorneys explained that LiiON was the first company to provide a UL certified lithium-ion based battery cabinet for sale; when Vertiv ended the relationship, and the capabilities of LiiON's product surfaced in the marketplace in other systems, LiiON believed its trade secrets had been compromised. [465] at 9. LiiON's attorneys also explained that they relied upon their client—who, based upon his industry expertise and experience—genuinely believed that Vertiv had misappropriated LiiON's secrets—to establish factual foundation for LiiON's claim. *Id.* at 11. Given these representations and viewing this case as a whole, this Court cannot say that LiiON's trade secret claims are the kind of egregious or groundless claims that merit Rule 11 sanctions. *See Cuna Mut. Ins.*, 443 F.3d at 560.

Vertiv also contends that LiiON sued for improper purposes, specifically to: (1) obtain Vertiv's technical information; (2) receive a financial windfall from LiiON's sale to a company called Lithium Werks, which discussed with LiiON the idea of suing Vertiv; and (3) exact revenge for Vertiv's termination of their contractual

relationship. [442] at 11. As support for these contentions, Vertiv primarily relies upon three documents attached to its motion. One of those documents appears to be an internal LiiON document that discusses "strategically suing Samsung with Vertiv to give us better access to technical information we knew they had." [442-1] at 18. This Court does not find that this remark evidences the improper purpose that Vertiv suggests—initiating litigation to obtain *Vertiv*'s technical information. Rather, this Court interprets the remark to mean that LiiON was initiating litigation to obtain access to *its own* technical information that it believed Samsung and Vertiv misappropriated.

Vertiv also relies upon two other documents—email chains—which remain the subject of debate between the parties: LiiON asserts that they constitute privileged documents that it inadvertently disclosed to Vertiv, and thus, should not be considered in connection with Vertiv's Rule 11 motion; Vertiv counters that the emails are not privileged. [465] at 15; [478] at 6. Without making any privilege determinations, this Court has reviewed the disputed emails and finds that, even if it were to consider them, they do not evidence an improper purpose. At most, they indicate a frustration on the part of LiiON that Vertiv had broken off their contractual relationship and turned to selling its own battery cabinets, and that LiiON was eager to use litigation to redress the wrongs it perceived that Vertiv had committed. These emails do not exhibit sanctionable conduct. *See, e.g.*, *Diamond v. Nicholls*, 483 F. Supp. 3d 577, 598 (N.D. Ill. 2020) (declining to sanction a party based upon emails showing he was "frustrated, even angry," in part because he also

"repeatedly protested that he had been wronged, in the legal sense, and was seeking justice"). For these reasons, this Court denies Vertiv's motion for sanctions [440].

## IV. LiiON's Motion to Alter Judgment

Finally, this Court addresses LiiON's motion [436], pursuant to Federal Rule of Civil Procedure 59(e), to this Court's January 22, 2021 opinion [419] ruling upon LiiON's objections to the magistrate judge's order [385] awarding fees to Vertiv based upon LiiON's discovery violations. In the January 2021 opinion, this Court affirmed the award of $20,664.70 for work Vertiv performed in seeking discovery sanctions and awarded Vertiv $63,408.15 for work it spent preparing for and taking the depositions of seven witnesses. [419] at 11.

Initially, this Court notes that Rule 59(e) concerns this Court's discretion to alter or modify a *final* judgment, *see Terry v. Spencer*, 888 F.3d 890, 892 (7th Cir. 2018), and thus is inapplicable here where final judgment has not yet been entered. Instead, this Court construes LiiON's motion as one for reconsideration of an interlocutory order. *See id.* ("Though Rule 59(e) did not apply, a district judge may reconsider an interlocutory order at any time before final judgment.").

Motions for reconsideration serve only a "limited function." *Caisse Nationale de Credit Agricole v. CBI Indus., Inc.*, 90 F.3d 1264, 1269 (7th Cir. 1996). To prevail on such a motion, the movant must establish "a manifest error of law or fact or present newly discovered evidence." *Lightspeed Media Corp. v. Smith*, 830 F.3d 500, 505–06 (7th Cir. 2016) (quoting *Boyd v. Tornier, Inc.*, 656 F.3d 487, 492 (7th Cir. 2011)); *Vesely v. Armslist LLC*, 762 F.3d 661, 666 (7th Cir. 2014). A motion for

reconsideration might also be appropriate if the movant shows "a controlling or significant change in the law or facts after the submission of the issues to the court." *Batchelor v. City of Chicago*, No. 18-CV-08513, 2021 WL 825607, at *2 (N.D. Ill. Mar. 4, 2021) (citing *Bank of Waunakee v. Rochester Cheese Sales, Inc.*, 906 F.2d 1185, 1191 (7th Cir. 1990)). A motion to reconsider that merely "rehash[es] previously rejected arguments or argu[es] matters that could have been heard during the pendency of the previous motion" will be rejected. *Caisse Nationale*, 90 F.3d at 1270. Instead, the moving party must show "wholesale disregard, misapplication, or failure to recognize controlling precedent." *Oto v. Metro. Life Ins. Co.*, 224 F.3d 601, 606 (7th Cir. 2000) (quoting *Sedrak v. Callahan*, 987 F. Supp. 1063, 1069 (N.D. Ill. 1997)).

LiiON fails to raise any argument appropriate for reconsideration. LiiON argues that this Court committed a manifest error by failing "to account for the reduction of fees for the attorneys taking the deposition" that Magistrate Judge Kim intended. [436] at 4. Not so. This Court agreed with the Magistrate Judge Kim that the fees were excessive and therefore found "no error with the magistrate judge's conclusion that the time spent on deposition preparation was excessive." [419] at 6. This Court only disagreed with the magistrate judge's method of calculating the fees. *Id.*

LiiON also takes issue with this Court's calculations of fees and argues, deposition by deposition, why it believes this Court should reduce its fee calculations. *See* [436] at 6–14. But LiiON points to no specific error and presents no new arguments or newly discovered evidence to support its arguments. Rather, it merely

disagrees with this Court's determinations and calculations regarding the appropriate fee awards and rehashes old arguments this Court previously considered and rejected. Such arguments remain inappropriate for reconsideration. *See Terese F. v. Saul*, 396 F. Supp. 3d 793, 794 (N.D. Ill. 2019) (observing that motions for reconsideration must not be brought to "express mere disagreement with a decision of the court"); *Oto v. Metro. Life Ins. Co.*, 224 F.3d 601, 606 (7th Cir. 2000) (holding that the district court properly rejected a motion for reconsideration that "merely took umbrage" with the court's rulings and "rehashed old arguments").

Having now denied LiiON's motion for reconsideration, this Court will consider the schedule for LiiON's remaining fee payments. LiiON already paid Vertiv $57,026.70 of the total $84,072.85 fee award, [419] at 10–11, and this Court stayed LiiON's obligation to pay the remaining amount pending resolution of its motion to alter judgment, [447]. LiiON requests to pay the final balance in three monthly payments starting 14 days after this Court's final ruling. [436] at 11. This Court grants LiiON's request as follows: the remaining $27,046.15 shall be paid by January 31, 2022.

## CONCLUSION

For the reasons stated above, this Court grants Vertiv's motion for summary judgment [424]; grants in part and denies in part LiiON's motion for summary judgment [431]; denies Vertiv's motion for sanctions [440]; and grants, in part, LiiON's motion to alter judgment [436]. As a result of this Court's summary judgment rulings, the only claims remaining are Vertiv's counterclaims for breach of contract,

breach of the implied covenant of good faith and fair dealing, and tortious interference. In addition, LiiON is ordered to pay the balance of its owed fees by January 31, 2022.

E N T E R :

Dated: October 26, 2021

MARY M. ROWLAND
United States District Judge